**STATE of Tennessee**

v.

**Jennifer SILISKI.**

Court of Criminal Appeals of Tennessee, at Nashville.

Dec. 12, 2006 Session.

May 15, 2007.

Application for Permission to Appeal Denied by Supreme Court Sept. 17, 2007.

Bonding Company was to be paid to Knox County and applied to the costs.

John E. Herbison, Nashville, Tennessee (on appeal); and Rebecca E. Byrd, Mark Waters, and Ken Sanney, Franklin, Tennessee (at trial), for the appellant, Jennifer Siliski.

Robert E. Cooper, Jr., Attorney General and Reporter; C. Daniel Lins, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Braden H. Boucek and Derek K. Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

**OPINION**

The defendant, Jennifer Siliski, was convicted by a Williamson County Circuit Court jury of eleven counts of animal cruelty. The trial court merged the convictions involving the same animals, resulting in nine convictions, and sentenced the defendant to concurrent terms of eleven months, twenty-nine days at 75% for each conviction, all suspended except for ten days, with the remainder of the time to be served on supervised probation, followed by eight years of unsupervised probation. The court additionally ordered that the defendant complete fifty hours of community service within the first year of supervised probation, that she be permanently prohibited from engaging in any commercial activity involving animals, and that she be subject to regular inspections of her home during her period of unsupervised probation to ensure her compliance with the terms of her sentence. On appeal, the defendant argues that counts 1 through 28 of the presentment were multiplicitious; the animal cruelty statute is unconstitutionally vague as applied in her case; the presentment failed to adequately state the facts constituting the offenses for which she was convicted; the trial court erred in denying her motion to suppress the results of the search warrant; the trial court erred in admitting a veterinarian's report into evidence; she did not adequately waive her right to testify under *Momon v. State*, 18 S.W.3d 152 (Tenn.1999); the trial court erred by ordering consecutive periods of probation; the trial court's permanent prohibition against her commercial activity involving animals is too harsh; and the trial court lacked jurisdiction to modify her sentence after the original date of sentencing. Following our review, we affirm the defendant's convictions but conclude that the trial court erred by ordering consecutive periods of probation in conjunction with concurrent sentences. Accordingly, we remand for resentencing.

*FACTS*

The defendant operated a dog breeding business, "Hollybelle's Maltese," in which she bred purebred Maltese dogs in her Franklin home, advertised the resulting puppies on an Internet website, and shipped the puppies to buyers located around the country. In response to complaints about the conditions in which she kept her home and animals, Investigator John Brown of the District Attorney's Office in Franklin and Debbie Leddy, Associate Director of Williamson County Animal

Control, went to the defendant's residence on the morning of January 22, 2004. Based on their observations and information supplied by the defendant's former kennel worker, Brown obtained a search warrant for the premises, which was executed at 5:20 p.m. that same day. Two hundred eleven dogs and twenty-one cats were found in various places throughout the home, and employees of animal control, working throughout the night, removed all but one dog from the home by 5:00 a.m. the next morning.[1] The defendant was subsequently indicted on thirty counts of cruelty to animals and one count of unlawful possession of a Schedule III controlled substance, ketamine hydrochloride, a drug commonly used as a veterinary anesthetic. The trial court later severed the possession count,[2] and on August 18, 2004, the defendant proceeded to trial on the animal cruelty counts of the presentment.

### Trial

### State's Proof

Investigator John Brown testified that on January 15, 2004, he, other members of the district attorney's office, members of the Williamson County Sheriff's Department, and members of Williamson County Animal Control conducted a meeting about the defendant. As a result, the district attorney advised him to look at the conditions of the defendant's home and, if he found that the place needed to be cleaned, allow the defendant to clean up the residence. Accordingly, at approximately 10:30 a.m. on Thursday, January 22, 2004, Brown, accompanied by other members of the district attorney's office and Debbie

Leddy, went to the defendant's residence located at 2235 Bowman Road in Franklin.

Within fifteen feet of his approach to the house, Brown was met by the "staggering" odor of ammonia. He noticed the defendant's vehicle parked out front, but no one answered his or Leddy's repeated knocks at the front door. After knocking on the front door for about fifteen minutes, he walked down the driveway, knocked on the back door, and called the defendant's name. No one answered the door, but he heard loud barking as he walked down the driveway. In addition, he saw numerous dogs in cages stacked three to five high in the converted garage attached to the house.

Brown subsequently obtained a search warrant, which he executed at 5:20 p.m. that day. Because of the number of animals he had seen at the residence, he requested and received the assistance of Williamson County Animal Control. After presenting the defendant with the search warrant and having her gather her family in the sunroom, he videotaped each room of the residence.

Brown testified that the odor inside the residence was "noxious and overwhelming" but was worst in the downstairs "kennel area," which he described as "stifling" and "smothering." The ammonia smell inside the house was so overpowering that he initially wore a respirator; however, two to four hours into the search he removed it because it was impeding his work. Brown stated that he began by videotaping the upstairs "nursery" area, where he found fifty dogs and twenty-one cats. The room

---

1. Investigator Brown allowed the defendant to keep the dog that she said was the personal pet of her handicapped daughter.

2. The trial court subsequently granted the defendant's motion to suppress evidence of the ketamine hydrochloride on the basis that its

seizure exceeded the scope of the search warrant. The State appealed, and this court affirmed the judgment of the trial court. *See State v. Jennifer Siliski,* No. M2004–02361–CCA–R3–CD, 2006 WL 2742345, at *1 (Tenn. Crim.App. Sept.27, 2006).

contained mother dogs and newborn puppies in cages on the floor and cats in cages that were stacked three high along one wall. Approximately ten mother dogs and newborn puppies were also in cages in the kitchen, and five or six additional dogs, which appeared to be house pets, were running loose throughout the home.

Downstairs in the attached garage or "kennel area," Brown found numerous small wire cages, each containing between one and four dogs, which were stacked three high along three walls of the garage. He described the scene:

> That's when you walked downstairs and it's just like animals everywhere; I mean, just cages and cages and dogs. It's just overwhelming. It was overwhelming to me, because, you know, I've seen animals at Animal Control, but I've never seen that many dogs in one small area. And they're all just, you know, barking and barking. There's just so many, it's just overwhelming.

Brown found feces, urine, and moldy food strewn over the floor and piled near the walls in the kennel area. There were no mats in the bottoms of the cages, and the dogs therefore were forced to stand or lie on wire bars that he estimated were two inches apart. In general, the dogs' coats were matted with urine and feces; their eyes were infected, with some of the animals' eyes matted completely shut; and their ears appeared to be clogged with a substance that looked like brown mud. Brown observed several dogs that appeared to have infected genitals. He also saw some dogs with rotten teeth and noticed a tooth lying on the floor. Other dogs had rashes and sores on their backs and were missing hair.

Although he had initially intended only to inspect the premises and give the defendant a chance to clean up, Brown decided to evacuate the animals after seeing their condition. He explained: "The animals appeared to be in need of medical attention. I mean, just to see what's coming out of an animal's nose or ears and the eyes matted shut, . . ., would lead me, as just a reasonable person—I'm not a vet or anything of that nature, but I could see that something was wrong." He said that it took thirty people working approximately twelve hours, until 4:30 or 5:00 a.m. the next morning, to properly identify, tag, and remove the animals from the home.

Brown testified that the defendant told him that she had not had any help since the previous Sunday. He asked her why she had not hired someone else, and she replied, "Good help is hard to find." She told him that she was the owner of Hollybelle's Maltese and that she sold approximately 120 dogs each year for a price of $700 to $1600 per dog. She admitted that she had tattooed the noses of one or two of her dogs to make them appear darker before selling them. She told Brown that she had been home all day but did not respond when he asked her why she had not answered the door that morning. She said she did not know how many animals were in the house. She told him, however, that only forty of the animals were hers. When asked if she could name the forty dogs she claimed as hers, the defendant said that one was named "Sha-shai" but then, according to Brown, appeared to be "making up names as she went along." She stopped after naming only about five dogs.

Brown identified photographs of the residence and dogs, as well as the videotape he made, which were admitted into evidence and published to the jury. The photographs and videotape show that the upstairs kennel room contained mother dogs and puppies in open-topped enclosures set up on the floor. Wire cages, each containing multiple cats, were

stacked along one wall of an adjoining closet. The downstairs "basement" or "garage" kennel room had small wire cages stacked three high along three walls, with either two or three dogs in most of the cages. The cages contained food and water bowls or hanging water bottles, but there were no visible liners, pads, blankets, or beds. Feces, urine, and dirty food covered the floor, the bottoms and sides of the cages, and the walls of the room. Photographs taken of the room after the cages were removed show feces not only piled against the wall but also on the windowsills behind where the cages were stacked.

Brown testified that many of the animals had no food or water in their cages. Other animals had food and water that were contaminated with mold, feces, and urine. He stated that the cats taken from the upstairs nursery were crammed three or four to a cage. He further testified that the dogs found in the defendant's home appeared to be in a state of pain or suffering.

Debbie Leddy, Associate Director of Williamson County Animal Control, testified that Animal Control had received numerous complaints about the defendant's animals over the years. Approximately one week before the issuance of the search warrant, Leddy participated in the meeting held at the district attorney's office, which was convened to discuss the numerous new complaints that various agencies had received about the defendant. Because it was determined that further investigation was needed, she accompanied Investigator Brown to the defendant's residence on the morning of January 22, 2004, "to knock on the door to see if [the defendant] would let [them] in." Leddy testified that she had no intention at that time of removing any animals from the defendant's home and explained that education played a large role in the investigations conducted by animal control.

Leddy testified that she spent several minutes knocking on the defendant's door and calling her name before walking down the driveway to see if anyone was doing yard work in the back. However, she saw no one outside and no one ever answered the door. She left at that point but returned during the execution of the search warrant to be available in the event that any animals needed to be removed. When she entered the home that evening, she saw general disarray and clutter and noticed feces and urine on the living room floor. She then went to the upstairs kennel area, where she saw so many animals that she initially assumed that it contained all the animals in the house. Leddy testified that the cats were in cages stacked in a closet off the upstairs kennel room. She saw at least two cats per cage, with some of the cats lying in their litter boxes, which she assumed was in order to have a soft spot to lie down. The cats' litter boxes were overflowing and it had obviously been "more than a few days" since they had been cleaned.

Leddy testified that she next went to the downstairs kennel area, where she was "shock[ed]" at the sheer numbers of dogs in cages. She had seen "lots of animals in houses, but never the quantity" that she saw that night. She stated that there were at least two, and oftentimes three or four, dogs in each medium-sized cage. She described the condition of the cages:

> They weren't just dirty as being dirty. What I want to say is, there was a lot of hair hanging on this cage. I'd always understood that Maltese didn't shed and what I saw was long strips of hair that was totally soaked in urine and, you know, that was part—there was mold on some of the food and the feces that was in the cages. And it was shocking to me to see that condition, yes.

Leddy stated that because the cages were stacked on top of each other, urine and feces were leaking from the upper cages onto the animals in the cages below. In addition, the animals were so close to each other that many of them, particularly the male dogs, were urinating on each other. She estimated that only 15% of the animals in the defendant's home had water and edible food; other animals had either no food or water in their cages or food and water mixed with feces or urine. The dogs did not appear to be socialized, as they were afraid to be touched. When she began to feed and water the animals, they ate and drank ravenously. In general, the animals appeared to Leddy to be in poor physical condition:

> I'm not a veterinarian, but in looking at the animals, the things that I noticed mostly about them, they had dull coats. And as I said, they felt dehydrated when touched. A lot of them were extremely nervous. Their eyes were runny. They appeared to have eye infections and then they had a lot of black material in their ears. . . . A lot them were very lethargic. They just didn't look good, I mean, they didn't look nice and healthy and shining and happy.

Leddy testified that she had worked in animal kennels for many years and that there was no way that the cages in the defendant's home could have reached the state in which the investigators found them in just a few days or even a few weeks. She said all fourteen staff members of animal control worked throughout the night, from approximately 5:00 p.m. until 5:00 a.m. the next morning, to remove the animals from the home. Some of the animals, which appeared to be in life-threatening condition, were immediately taken to receive emergency veterinary care.

Dr. Paula Schuerer, a small animal veterinarian with a practice in Cool Springs, testified that Investigator Brown called her at approximately 8:00 p.m. on January 22, 2004, and asked her to come to the defendant's residence. Before even entering the residence, she was struck by the strong smell of ammonia, which was "usually associated with large quantities of urine and fecal matter." Inside, she found the basement kennel area "extraordinarily dirty," with piles of fecal matter, large puddles of urine, and small, two-foot-by-two-foot metal cages stacked three to four cages high, with each cage containing two to three dogs. In Dr. Schuerer's opinion, the cages were too small for the number of dogs they contained:

> First of all, when you have a cage that was, I assume, was about two-by-two and you got two small dogs trying to share that and you got food and water bowls in that area, you can readily see that you don't have very much more square footage. You can't even lie down hardly and stretch out completely.

Dr. Schuerer testified that many of the animals exhibited signs of being "cage crazy," a term used to describe the condition in which a caged animal will behave oddly by spinning in circles, biting at the bars of its cage, or scratching or digging in an effort to escape. Based on the amount of fecal matter, it was also clear to Dr. Schuerer that the cages had not been cleaned in "quite a bit of time." The dogs were, therefore, forced to repeatedly stand and step in their own waste which, combined with the slatted surface that formed the bottom of the cages, had the potential of causing sores on the dogs' feet:

> The type of cages that were there contained slat[t]ed or essentially metal barred bottoms. You're talking about small dogs and their paws will literally try to fit through these wires. That can

induce sores upon the bottoms of their feet. Also it doesn't allow for proper waste handling because when they defecate in there they then are constantly stepping in it until it gets small enough to fit through the bars.

In Dr. Schuerer's opinion, such cages were not designed for long-term housing: "Again, the slat[t]ed bottoms, it would be like trying to walk on sticks, essentially, for lack of better words, because you got just metal rods to stand on, you don't have good support of weight. You end up having deformities to their feet and such." She also said that the levels of ammonia associated with the "tremendous amount of waste" in the cages would have burned the nasal passages and eyes of the dogs: "And if anybody has ever opened a bottle of ammonia and taken a big whiff of it, you understand what I'm talking about because it burns the nasal cavity, it burns the eyes and such and it's going to do the same to an animal."

Dr. Schuerer estimated that she eventually treated between fifty and sixty of the animals removed from the defendant's home. In her testimony, she described the treatments she provided for several of the animals that were referenced in various counts of the presentment. However, we will recount only her specific testimony with respect to those animals referenced in the counts for which the defendant was convicted.

Dr. Schuerer testified that she treated "V–2," a Maltese that she noted was "isolated to a cage by itself on the floor ... sitting in its own puddle of blood within the cage." V–2, which was referenced in counts 3 and 4 of the presentment, was "[v]ery nonresponsive" to all the activity going on in the room, and it was apparent to Dr. Schuerer that the dog was "very, very critically ill." Upon examination, she found that this dog, an adult female that presented with "frank amounts of blood dripping from the vulva" and "covered in blood all down the back rear quarters," was severely dehydrated and suffering from pyometra, a potentially life-threatening infection of the uterus. Dr. Schuerer stated that pyometra commonly occurs from the introduction of fecal matter into the vulva of a dog in heat. V–2's uterus was painfully distended and filled with approximately one cup of pus. In addition, her white blood cell count was 83,900, five times the normal level and the highest white blood cell count that Dr. Schuerer had ever seen in a patient. Among other things, V–2 also had severe dental calculus, ear mites, a yeast infection within the ear canal, elevated liver enzymes, a very low blood protein, and was anemic. Dr. Schuerer testified that she gave the dog intravenous fluid therapy to combat her severe dehydration and then performed an emergency spay to remove her infected uterus.

Dr. Schuerer also treated "C83, D161," a female Maltese referenced in counts 19 and 20 of the presentment. She testified that this dog, which had an intermittent bloody vaginal discharge, presented for a possibility of pyometra. Upon examination, she determined that the dog appeared to have a retained placenta. She also found that the dog was suffering from an "oral nasal fistula," or a hole connecting the mouth to the nasal cavity, the result of a missing tooth. She said that the dog had severe periodontal disease and that the few teeth she retained were covered in severe tartar. In addition, the dog's ear canals were thickened and malodorous and she had an active yeast infection in her ears.

Dr. Schuerer also treated "C34, D64," a female Maltese dog referenced in counts 15 and 16 of the presentment. This dog, which she estimated to be between eight

and ten years of age, suffered from hypothyroidism, a condition which, according to Dr. Schuerer, is easily treated with a simple daily medication that costs less than $10 per month. The dog was morbidly obese as a result of the untreated hypothyroidism, and her extra weight had caused her front wrists to break down, resulting in painful arthritis. Among other things, the dog also had severe periodontal disease, a yeast infection in her ear canal, ear mites, and was moderately anemic.

In the animals she treated, Dr. Schuerer found yeast and fungal skin infections; calcified ear cartilage caused by untreated ear mites; urinary tract infections; upper respiratory infections; coccidia, a contagious protozoal intestinal parasite; sarcoptic mange; giardia; campylobacter, a bacterial infection; and chlamydia, a highly contagious bacterial infection that causes extreme conjunctivitis of the eye. Some animals had pseudocoprostasis, a term used to describe the condition in which a large quantity of fecal matter is entangled in an animal's fur around its anus, "literally blocking the anus such that other fecal matter may not be expelled." She also found "fecal scald" and "urine scald," which is an irritation of the skin caused by prolonged contact with feces and urine, on some of the dogs. In Dr. Schuerer's medical opinion, these illnesses and conditions originated from the unsanitary conditions present in the defendant's home.

Dr. Schuerer testified that there was no doubt in her mind that the dogs that formed the basis for the counts charged in the presentment were in a state of unreasonable pain and suffering. In her opinion, the defendant failed the animals in a number of ways: "I think she failed on several issues. I don't think that she provided appropriate shelter, appropriate care, and for many of them, inappropriate food or water. Some of the water that I did note was present was contaminated with not only feces, but also some urine."

Vinissa Bailey testified that she was an officer at Williamson County Animal Control and assisted in the evacuation of the animals from the defendant's home. The first thing that struck her about the residence was the "breathtaking, overwhelming" smell of ammonia, which took her breath, burned her sinuses, lungs and throat, and left her with a sore throat for days afterwards. She described the conditions inside the residence as "atrocious," with trash and clothing strewn everywhere and feces on the floor. In the downstairs kennel room, she saw filthy, feces-and-urine-coated wire cages, each containing between two and four dogs. Most of the dogs did not have any food or water; the food and water that she did see was contaminated by feces, mold, and urine. Upstairs, she saw multiple cats to a cage, with "[s]ome of them . . . even sleeping in the litter box to have somewhere to lay."

Officer Bailey testified that many of the animals appeared to be physically ill:

I mean, I'm not a vet, but you could tell by looking at these dogs they were just—they had scabs on them. They had hair missing. The ones that [did] have hair, the little hair they had was all matted, I mean, to the point their eyes were matted shut.

Their ears were black on the inside it looked from infection. Their eyes were running. Noses were running. I mean, it didn't take a vet to be able to realize how these dogs needed help.

Some of the cats also appeared to be ill: "Some of the cats were . . . their tails were matted up so bad and full of feces that some of them couldn't even use the bathroom."

Based on the amount of feces she saw, it was evident to Officer Bailey that it had been longer than just "a period of days"

since the cages had last been cleaned. With respect to the amount of feces in the downstairs kennel, she testified:

> There was just tons. I mean, it was in the windowsills. It was on the walls. It was in the floor. I mean, we were literally having to watch our step to be careful because of the amount of it. It was slick, you know, and we were having to be careful that we would not fall in it.

Officer Bailey testified that animal control removed 210 dogs and 21 cats from the home. She said that she and Investigator Brown started in one corner and began the laborious process of recording and labeling each animal prior to its removal, marking it as, for example, cage one, dog one; cage one, dog two; and so forth.

Dr. Mary Fooshee, a small animal veterinarian, testified that she was also involved in the execution of the search warrant at the defendant's home on January 22, 2004. The first thing that she, like others, noticed about the residence was the overpowering smell of urine and feces. As she proceeded further into the residence to the areas where the animals were housed, the smell made her physically ill and she went outside and vomited before returning to examine the animals. She stated that some of the mother dogs and puppies were housed in pens that were of an adequate size, but most of the animals were in cages that measured "approximately well under 2 feet by little under 3 feet" and were "totally inadequate" for the number of animals in them. She recalled seeing only two cages that housed only one animal; the others contained "two, all the way up to four dogs" per cage.

Dr. Fooshee testified that it appeared as if the dogs' cages had not been cleaned in "days" and that the cats' litter boxes had not been cleaned in over a week. Moreover, she saw very little edible food or water in the cages:

> If any of the dogs did have food in their bowl, there was—pretty much all of them had feces in them and some were no water. They couldn't escape their own excrement.
>
> A lot of the dogs you just—you couldn't tell just how bad they were until you got in and you touched them. A lot of them were just drenched from urine and feces. I'd never seen anything like it.

Dr. Fooshee testified that the cats were urinating and defecating "where they stood," as there was "no way for them to get away from it." She said when someone asked the defendant if she cared about the cats, which, in Dr. Fooshee's opinion, were in even worse shape than the dogs, the defendant replied: "I don't give a fuck about the cats. I only want the dogs that are owned by other people to go back."

Dr. Fooshee testified that she discovered dog V–2, referenced in counts 3 and 4 of the presentment, lying in her cage. The dog was bleeding from the vulva, was too weak to stand, and was in shock when they pulled her from the cage. Dr. Fooshee testified that she made a presumptive diagnosis of "pyrometra or pus inside the uterus that ... had been there long enough that it had eaten through her uterus and in the blood vessels."

Dr. Fooshee examined C114, C220, a five-week-old female kitten referenced in counts 5 and 6 of the presentment. She said that this kitten, which was in shock due to a severe respiratory infection, was "just lying there" with pus draining out of her nose and her eyes crusted shut. Although they gave her intravenous fluids and antibiotics, the kitten was too weak and did not survive. A subsequent necropsy revealed that she had "absolutely no body fat," which was very unusual for a

kitten. In Dr. Fooshee's medical opinion, the kitten's lack of body fat was the result of starvation.

Dr. Fooshee also examined C117, C228, an approximately five-week-old Ragdoll kitten, referenced in counts 7 and 8 of the presentment, which did not appear to her to be any better fed than kitten C114, C220. This animal, which was housed with three or four other cats, was lying in its cage "mouth-breathing," which cats do either in times of stress or when suffering from severe respiratory infections. Its eyes were sealed shut, pus and mucus were draining from its nose and eyes, and its anus was sealed shut by diarrhea. Pus "poured out" when she cleared the kitten's nose. Dr. Fooshee opined that the kitten had been sick for at least two weeks with a prolonged viral infection that had led to a secondary bacterial infection. She said she saw no signs of the kitten having received any medical treatment during that time. This kitten later died.

Dr. Fooshee testified that she examined C10, D17, referenced in counts 11 and 12 of the presentment, a female dog that she estimated to be at least thirteen or fourteen years old. The dog's mandible was eaten away and malformed from severe, chronic periodontal disease; she was deaf from an ear infection that had been left untreated for years; she had numerous mammary tumors; and she had bilateral corneal ulcers in both eyes. She was also extremely thin and so weak that she could barely stand. Dr. Fooshee said that this dog was in heat and was obviously still being used for breeding, which was life-threatening for a dog of her advanced age and condition.

Dr. Fooshee also examined C34, D64, the dog with severe hypothyroidism referenced in counts 15 and 16 of the presentment. She testified that a dog with such severe hypothyroidism does not often appear hungry because of its slowed metabolism. However, this dog was ravenous when given food, indicating to Dr. Fooshee that she had not been fed in some time.

Dr. Fooshee examined C24, D45, an approximately one-year-old female dog that was referenced in counts 17 and 18 of the presentment. She said that this dog was very malnourished and thin, with fur that was extremely matted with feces and urine: "When we got to her feet it took us at least an hour to get all of the hair off, the matted hair, off of her feet, it was so soaked in urine and feces and her toenails had started to grow through and under." Dr. Fooshee estimated that it would have taken months for the dog's toenails and feet to reach this condition. She said that when she was finally able to remove all the matted hair, she found painful urine burns on the pads of the dog's feet which would have taken more than a week, and possibly two weeks, to form. In addition, the dog's eyelids and nose appeared to have been tattooed.

Another geriatric dog that Dr. Fooshee examined was C83, D161, which was referenced in counts 19 and 20 of the presentment. This dog, which she estimated to be at least fifteen or sixteen years old, had only two or three teeth, was deaf, and was blind from advanced cataracts. She also had mammary tumors which, according to Dr. Fooshee, are stimulated into growth by hormones released during pregnancy. Nevertheless, the dog was pregnant at the time of seizure and subsequently gave birth to a litter of puppies. The dog was too weak to care for the puppies, and they were given to another female dog to nurse. Dr. Fooshee opined that breeding C83, D161 was hazardous to the dog's health.

Dr. Fooshee also examined C65, D127, a male Maltese, referenced in counts 25 and 26 of the presentment, which presented with a sustained erection. She testified

that almost all the male dogs in the defendant's home had persistent, simultaneous erections, which she attributed to the pharmacological influence of a drug such as Viagra. Based on the appearance of the dogs' penises, she concluded that the erections she observed on the dogs, including C65, D127, had lasted for hours:

> They [the penises] were so engorged with blood and swollen that the covering of the penis had gone to the base and started to constrict the blood flow to the penis. Subsequently it was turning dark red. It had hair and feces all stuck on it. And it was bleeding from the surface areas of the penis.

Dr. Fooshee testified that she treated these dogs' painful conditions by keeping their penises clean and lubricated and administering pain medication. The erections gradually subsided over the course of the next day and a half; had they persisted, the dogs' penises would have necrosed, or died.

Dr. Fooshee also examined a West Highland Terrier, "C3, D5," referenced in counts 27 and 28 of the presentment. This dog was "so intensely paretic, itching" that "it couldn't take two steps without chewing on itself or clawing, scratching until it would bleed." Dr. Fooshee determined that the dog had severe allergic skin disease, ringworm, and sarcoptic mange. She stated that this dog "had self-mutilated herself chewing at the itching" and was "bleeding from those areas."

Dr. Fooshee testified that the conditions in which the defendant's cats and dogs were housed were likely to result in the unreasonable pain and suffering of the animals. In her opinion, the various problems and conditions she observed in the animals "were weeks, months, years in the making."

Amber Morton, who was a daily caretaker for the defendant's handicapped daughter from March 2003 until August 2003, testified that sometime during March or April of that year she saw the defendant throw into the trash a newborn puppy, which was missing a limb, saying, "This is a fucking waste." Appalled, she asked the defendant how she could do such a thing to a living puppy. The defendant responded by repeating that the puppy was "a waste" and that she was not going to "spend her time and money keeping it alive" when she would not be able to get any money from it. Morton testified that she saw the defendant do the same thing approximately two months later to another newborn, deformed puppy. As in the first instance, she could hear the puppy still "crying and whimpering" after it had been thrown into the trash.

James King, who had provided Saturday trash pickup for the defendant's home, testified that during the summer of 2003 he found a two-or-three-day-old white puppy alive in a black trash bag in his load of trash. He said that he took the puppy home and attempted to raise it, but it died two to three days later. He acknowledged that he saw no obvious deformities on the puppy and could not tell from which home it had come. He stated, however, that the puppy looked similar to the Maltese dogs he had seen on television news reports about the defendant's case.

### Defendant's Proof

Brian Adams, an industrial hygiene compliance officer with the Tennessee Occupational Safety and Health Administration ("OSHA"), testified that he tested the defendant's home for the presence of ammonia on January 22, 2004, and obtained a reading of nine parts per million. According to Adams, Tennessee OSHA has "a short-term exposure limit of 35 parts per million" for an industrial setting. He said that he had never before performed the

test in a residential setting and that the detection tube he used for sampling the defendant's home had a "pretty big" margin of error of 15 to 20%. On cross-examination, he testified that the defendant's house was the most noxious smelling place he had ever encountered; the downstairs kennel area caused him to gag and made his eyes water. Therefore, he went back upstairs to retrieve his "Haz–Mat respirator," which he had never before had to wear during an inspection.

Alan Siliski, the defendant's ex-husband, testified that he regularly stayed at the defendant's home and was familiar with her dog-breeding business. He stated that the defendant employed two sisters, Karen and Julie Burnham, as kennel workers, with Julie working eight-hour shifts each day during the week and Karen working eight-hour shifts each day of the weekend. According to Siliski, the sisters daily checked on the condition of all the animals, administered medication as needed, fed and watered all the animals, and cleaned and bleached their cages. In addition, they groomed the dogs and occasionally ran errands to the veterinarian's office or the store for supplies. He said that in the evenings one of the defendant's family members checked each animal's food and water bowls and refilled them if necessary. He testified that he had never seen the defendant throw a deformed puppy in the trash and that whenever a puppy was sick the defendant would stay up all night to tend to it.

Siliski testified that he and the defendant's children helped take care of the animals during the week of January 22, 2004, because Karen and Julie Burnham both failed to show up for work "for about three days." He said that the defendant, who was frantic, called to tell him that "she had a whole lot of work to do in the kennel because [the Burnham sisters] had left it in a big mess." He testified that he was in the kennels during that week and did not notice any animals without food or water. According to Siliski, during that time he fed and watered the cats, changed their litter, and cleaned their cages.

On cross-examination, Siliski acknowledged that he was not that involved in the kennel business during January 2004 and did not often go into the lower kennel. He insisted, however, that the defendant provided excellent care for all her animals and that each dog was let outside its cage for daily exercise. He conceded that most of the dogs were not house pets but said he believed the declaration the defendant made on her website, that "all our dogs are raised in our home with our four children," was an accurate statement. Finally, he testified that the defendant's breeding operation was not a puppy mill because, unlike a puppy mill operator, she took good care of her animals and was not just trying to make money from them.

Valerie Clark, an officer with Williamson County Animal Control, testified that she kept birth and death records for the animals that were removed from the defendant's residence. She acknowledged that she had made some mistakes in her recordkeeping and had once or twice failed to accurately record the sex of a newborn puppy. She explained, however, that animal control had experienced sixty-four births in forty days and was overwhelmed with the number of animals needing urgent care. She said that recordkeeping was also complicated by the fact that hundreds of citizens had volunteered to help care for the animals, such that on any given day there were between twenty and forty volunteers working alongside the twelve to fifteen employees in animal control.

Julie Burnham testified that she had worked as a kennel worker for the defen-

dant five days per week, seven and a half hours per day, during 2003. She was originally assigned to clean the cages and feed and water the animals. However, during the last three months of Burnham's employment, the defendant began assigning her additional duties, including medicating and grooming the dogs. Burnham testified that she worked the Friday before the execution of the search warrant and had planned to return the following Monday, but quit work when the defendant announced that she was reducing her work schedule to two days per week because she could no longer afford full-time help.

Burnham testified that she did the best job she could when she worked for the defendant but never had enough time to do everything the defendant asked her to do. Asked how the kennel looked on her last day of employment, she stated:

> The way it usually looked when I left. It was never clean, but if there were times were [sic] I didn't have time to, you know, take and pull everything out and scrub the cages and stuff like that, because I was upstairs for six hours at a time just on the upstairs, and so I would make sure they at least got fresh food and water. I can't remember exactly whether I had time on that day or not, but I know they were fed and watered and the upstairs was okay.

Burnham testified that when she came to work each morning, it did not appear to her as if the animals had received any care since she left the previous day. She said the defendant originally provided paper for her to use as lining for the trays but then told her that she could no longer afford it. Whenever Burnham had time, she would scrape the wire at the bottoms of the cages, empty the trays beneath, and disinfect the trays with Pine–Sol. However, she did not attempt to clean the entire cages because she would have been "there

forever" had she tried to do that. She said that the only exercise the downstairs kennel dogs received was the three to four minutes per day they spent running around in a "kiddie pool" while she cleaned their cages.

Burnham testified that she occasionally worked nine-or ten-hour shifts in an effort to get more done. However, it was impossible for one person to do everything in a single day that the defendant required, as she told the defendant. She said that the defendant never helped clean the kennels but came to both the downstairs and upstairs kennels every day and was aware of the appearance of the areas. Burnham stated that she never saw Mr. Siliski in the downstairs kennel and that the defendant had told her that he refused to enter that area of the house.

Burnham testified that the defendant was "rough" with the dogs, but she never saw her hit or punch them. She said that she never saw the defendant throw a live puppy in the trash, but it would not have surprised her if she did. She stated that the defendant never asked her to give any of the dogs Viagra. She acknowledged that the defendant spent a lot of money on veterinary bills but only "for the dogs that were going to make money for her." There were several times when she informed the defendant that a "kennel dog" needed treatment, but the defendant did not take it to the veterinarian. Burnham testified that the kennel dogs received very different treatment from the defendant's house pets.

Burnham stated that the defendant never accepted responsibility for any problems that occurred in the kennels: "It was always somebody else's fault no matter what happened." She said that it was sometimes hard for the female dogs to become pregnant because the defendant had only six or seven male dogs versus

over 100 female dogs and the male dogs were "just overworked." The defendant got angry at Burnham and her sister if the dogs did not breed enough, saying, "I'm not making money, I can't pay you girls if I don't make money, I need more puppies, more puppies, more puppies."

Burnham testified that the defendant once asked her to hold a puppy down while she tattooed its eyelids. The puppy screamed and she told the defendant she could not hold it, so the defendant held it down herself while she finished the job. Burnham believed that her sister's boyfriend, who was a tattoo artist, also tattooed one or two puppies for the defendant. According to Burnham, a Maltese puppy's nose and eye line darkens as it ages, and the defendant tattooed the puppies to make them appear old enough to sell. She stated that the defendant charged between $1000 and $2000 per puppy and that her usual practice was to either ship the puppies to their buyers or have her husband deliver the puppies at a location outside the home.

Margie Largin, a breeder of Yorkshire Terriers and a ten-year acquaintance of the defendant, testified that it was standard practice to keep small, long-haired breeding dogs in wire kennel cages because it keeps the dogs' coats clean. According to Largin, maintaining the cleanliness of a kennel cage is an ongoing process and it is not uncommon for a cage to appear dirty in a very short amount of time. She did not think it cruel to place more than one dog in a single cage because dogs are pack animals and enjoy socializing with each other. She said that up until two years before the execution of the search warrant, she had visited the defendant's kennels on a weekly basis and never saw anything that caused her to be concerned about the animals. On cross-examination, she testified that she spent as much as six hours per day caring for the five Yorkshire Terriers she currently had in her kennels. She further testified that she at one time had seventeen animals and had worked all day to properly care for them.

Dr. Paul Vaden, a veterinarian at the Williamson County Animal Hospital, testified that the defendant had been a client for approximately eight years and had sent, on average, one animal per week to the clinic during the two months prior to January 22, 2004. He agreed that eye and ear problems occur fairly frequently in Maltese dogs and that some health conditions, such as arthritis and cataracts, occur naturally with aging. He said that he talked to the defendant about her dogs' dental care, and she authorized him to perform a dental cleaning whenever any of her animals had to be anesthetized for another procedure. His records reflected that his clinic had, among other things, treated two of the defendant's dogs for pyometra, one for eye ulcers, and another for mammary tumors. He had also referred one of the defendant's animals to a veterinary specialist at the University of Tennessee for a liver shunt.

Dr. Vaden acknowledged, however, that he and his staff had become concerned that the defendant had "too many animals for one person." He said he had never seen the defendant's residence and had no idea that she had 231 animals; had he known, he would have confronted her about the situation. He stated that his clinic boarded on average 100 animals per day and employed eight rotating kennel workers, so that the clinic was staffed with four full-time kennel workers from 7:00 a.m. to 7:00 p.m. each day. When shown pictures of the defendant's kennels, he agreed that the conditions were very dirty and did not exhibit appropriate care.

Ellen Perry, a member of numerous dog clubs and an exhibitor at American Kennel Club ("AKC") events for thirty-two years, testified that it was standard practice to keep long-coated dogs in wire cages to prevent breakage of their coats. She further testified that such cages were designed to be stacked and that the organizers of AKC events require exhibitors to stack their cages at dog shows. She did not think it cruel to keep more than one dog in a cage and believed that one full-time kennel worker, if diligent, was sufficient to care for 231 animals. She had known the defendant for approximately three years and had seen her upstairs kennel area in the six months prior to the execution of the search warrant. She had also viewed the videotape in the case and could detect no signs of the defendant's animals being mistreated, neglected, or in poor health. In her opinion, it would have taken only "a couple of days" for the spilled food and waste material, visible in the videotape, to accumulate on the floor of the kennel. On cross-examination, she testified that she had twenty-five animals in her home and spent approximately four hours a day caring for them. She also acknowledged she had never been in the defendant's downstairs kennel and therefore had no firsthand knowledge of the conditions in that area.

Eddie Whitaker, the defendant's sixteen-year-old son, testified that during the time the Burnham sisters were employed as kennel workers he regularly helped the defendant in the evenings by cleaning the cages and feeding and watering the dogs in the upstairs kennel room. He said that the dogs were let out of their cages for daily exercise and that he and his siblings played with them for up to two hours each day. According to Whitaker, the Burnham sisters did a good job while employed at the kennels, but both quit without giving notice. As a result, he, his sister, his brother, and Alan Siliski had to help the defendant with both the upstairs and downstairs kennel areas during the week prior to the execution of the search warrant.

Whitaker stated that he had often witnessed the defendant giving tender nursing care to a sick or weak puppy and had never seen her throw a live or deformed animal in the trash. He said that the defendant had several animals that were deformed or missing limbs and that she provided the same level of care to her kennel dogs as her house pets. He had never seen the defendant tattoo a dog, although he had seen a tattoo gun in the residence. He had never seen any trays overflowing with feces or urine. He said it did not take very long for the cages to become soiled after being cleaned because some of the animals "liked to go on fresh paper."

### Sentencing Hearing

### State's Proof

At the defendant's September 13, 2004, sentencing hearing, Debbie Leddy testified that Williamson County Animal Control had received a number of written and verbal complaints about the defendant during the past seven or eight years, originating both from the defendant's neighbors and from purchasers of her puppies. Leddy visited the defendant's residence on three separate occasions prior to January 22, 2004, and each time admonished her to clean the premises and provide better care for her animals. However, the defendant did not appear to take her admonishments seriously. The defendant had only thirty-five to forty-five animals at those times and the conditions were not as bad as those on January 22, 2004.

Leddy testified that she believed the defendant was operating a puppy mill,

which she defined as "an excess number of animals that are being bred for profit and are often not kept in sanitary conditions and not having the proper vet care that is required." According to Leddy, Williamson County Animal Control was currently investigating two other possible puppy mill situations in Williamson County and, in addition, regularly received requests to provide assistance in the investigation of puppy mill operations in nearby rural counties. She said she had seen the number of puppy mills in Williamson and surrounding counties rise in recent years and did not believe there were currently enough resources or manpower to combat the problem.

Two purchasers of the defendant's dogs, Dwayne Whitson and Jack Gillespie, each described the problems they had encountered with the animals. Whitson testified that he purchased three West Highland Terriers from the defendant in December 2003 and that all three dogs were in extremely poor health, but the defendant refused to take the dogs back or refund his money. Because he did not want sick animals in his home with his children, he surrendered the dogs to Williamson County Animal Control. Gillespie testified that in July 2002, he and his wife purchased a Maltese puppy from the defendant, which died six days later. Although the defendant offered to sell him another at half-price, she refused to give him a healthy replacement or refund his purchase price. Gillespie said he decided to forget about getting another puppy from the defendant after going to her home and being struck by a strong ammonia smell originating from the open windows of her garage which burned his eyes from his position 125 feet away.

Houston Naron, Chairman of the Board of the Williamson County Commission, testified that since January 22, 2004, William-

son County had expended $91,947.66 as a direct result of the seizure of the defendant's animals. He said that although the county would like to recoup those expenses, many of the animals were currently in the care of foster families, who had also expended funds for their care. In light of those unique circumstances, the board and the mayor supported the district attorney's recommendation that the animals be placed for adoption with the foster families afforded first choice and "certain consideration" being given "for documentable expenses that [the foster families had] paid to take care of those animals."

### Defendant's Proof

Alan Siliski testified that he and the defendant had an eleven-year-old daughter, Holly, who was born with Rett Syndrome and functioned at the level of a three-to-six-month-old child. The defendant and Holly had a very close relationship and the defendant provided daily therapy for Holly in an effort to improve her physical coordination and speech. Siliski believed that Holly would regress if deprived of the defendant's care. On cross-examination, he acknowledged that dependent and neglect petitions had been filed on the defendant's children in juvenile court in 1995, 2002, and 2004 and that school officials had complained about Holly's filthy clothing. He further acknowledged that the defendant had never expressed any remorse to him for her actions in connection with the instant case.

David Pratt, the probation and parole officer who prepared the defendant's presentence report, testified that the defendant informed him of Holly's condition and special needs. On cross-examination, he said that the psychological report the defendant submitted in connection with her application for pretrial diversion stated

that the defendant "suffered from perceptional distortion and narcissistic personality disorder with histrionic elements."

Chrystal Johnson testified that she worked with Family Support Services and had been referred Holly Siliski's case in March 2004. She had noted that Holly was very attached to the defendant and believed there was a possibility that Holly would regress if deprived of the defendant's care.

Regina Case testified that she was employed at Care All Home Solutions and had been Holly's caregiver for the past three months. Because Holly regressed when deprived of the defendant's presence, she believed it would be in Holly's best interest for the defendant to receive probation.

Pat Corzale, the defendant's neighbor, testified that she helped the defendant provide water therapy for Holly at the YMCA pool and had observed that Holly was very bonded to the defendant. Corzale expressed her opinion that the defendant was a "wonderful person" with a "beautiful family." She believed that the defendant deserved probation because she had reviewed the evidence in the case, including the videotape, and saw no signs of the animals having been abused. Asked if the defendant had ever expressed any remorse for her actions, she replied that the defendant did not think she had broken any law.

Erica Lewis, a caseworker with Family Support Services, testified she had observed that the defendant was constantly involved in the care of her children, actively sought out rehabilitative treatment for Holly, and followed the recommendations of Family Support Services. On cross-examination, she testified that the defendant's daughter, Brittany, had been referred to Family Support Services in 2002 for environmental neglect.

## State's Rebuttal Proof

Karen Burnham testified that during the time she was employed as a kennel worker at the defendant's home Mr. Siliski did more for Holly than the defendant did. She did not often see the defendant interact with Holly and on more than three occasions arrived at the home to find that the defendant had gone out and left Holly home alone.

In his argument on sentencing, the assistant district attorney requested a lengthier period of probation as opposed to a lengthy jail sentence on the basis that it would afford the State the best opportunity to ensure that the defendant did not return to her former breeding practices:

> So I guess I just wanted to impress upon the Court that although we are asking for jail time, if we had the choice between a lengthier period of time on probation and a little or no jail time, we would certainly take the lengthier period on probation because that's a way we can be assured that animals in the future aren't going to be harmed by [the defendant].

At the conclusion of the hearing, the trial court sentenced the defendant to concurrent terms of eleven months, twenty-nine days at 75% for each of the nine animal cruelty convictions. In its determination of the manner of service of the sentence, the trial court considered, among other things, the defendant's lack of a prior criminal record; her familial circumstances, including the special needs of her handicapped child; the fact that she had been "running a puppy mill" where "she sacrifice[d] everything," including the welfare of her own children, "for the single goal of making money"; her total lack of remorse for her actions; and the need to deter others from engaging in similar con-

duct in the future. The trial court, therefore, ordered that the defendant serve ten days in jail for the first conviction with the remainder of the time on supervised probation, followed by eight consecutive periods of unsupervised probation.

Additionally, the trial court ordered that the defendant complete fifty hours of community service during her first year of supervised probation; that she forfeit all animals except for four dogs that the court had earlier allowed the defendant's four children to have as their personal pets; that the forfeited animals be sold at public auction pursuant to a judicial sale with proceeds to go toward the payment of the $27,500 fine fixed by the jury and restitution owed to the county; that the defendant be responsible for spaying or neutering the four personal dogs within thirty days of the hearing; that the defendant be permanently prohibited from buying, selling, breeding, or engaging in any commercial activity involving animals pursuant to the animal cruelty statute; and that probation officers conduct regular inspections of the defendant's home during her entire period of probation to ensure that she complied with the court's permanent prohibition against her commercial activity involving animals.

On September 23, 2004, the trial court entered a written "Judgment" which, among other things, enumerated the special conditions of the defendant's sentence; set a October 16, 2004, date for the public auction; and decreed that any proceeds from the auction be paid into the circuit court clerk's office pending the county's presentation of proof of expenses and the trial court's determination of the proper amount of restitution. However, on September 30, 2004, the Williamson County Commission passed a resolution requesting cancellation of the public auction and authorization of an alternate method of disposal of the animals. Consequently, on October 8, 2004, the trial court entered an "Amended Judgment Order" providing that, pursuant to an agreement that had been reached by the parties, the defendant forfeited her interest in all but seven of the dogs, which she was required to sterilize; the County and the State waived their right to restitution from the defendant; the State waived all fines assessed by the jury; and the defendant was to be allowed to serve her ten-day sentence on weekends while her children were in the custody of their respective fathers. On December 21, 2004, the trial court entered the standard judgment forms in the case.

### Bond Revocation Hearing

The trial court originally stayed service of the defendant's sentence, including her probation, pending the outcome of her appeal. However, as a condition of her supervisory bond, the trial court ordered that a probation officer regularly inspect the defendant's home to ensure that she was complying with the court's orders with respect to her ownership of animals. On February 3, 2005, the State filed a motion to revoke the supervisory bond based on the defendant's violation of the court's prohibition against breeding animals.

Among the witnesses who testified at the February 15, 2005, bond revocation hearing was Carolyn Martin, a caregiver employed by Care All Home Care Services, which had contracted with TennCare to provide around-the-clock care for the defendant's handicapped daughter. Martin testified that she worked in the defendant's home from November 2004 until approximately one month prior to the hearing. She said that on four or five different occasions she saw someone bring a dog to the house and give it to the defendant who, syringe in hand, would then turn the dog upside down and carry it

downstairs. Martin stated that the defendant, who was very talkative, later explained to her that she was artificially inseminating those dogs. The defendant also told her that she shipped semen to other individuals. On another occasion, Martin saw a pregnant dog in the home, expressed an interest in purchasing one of its puppies, and was told by the defendant that she could not afford it because the defendant sold her dogs all over the world for $5000 to $10,000 per dog.

Regina Case, another caregiver employed by Care All, testified that she had been working in the defendant's home since July and had seen three small white puppies approximately four or five weeks prior to the hearing. On February 3, 2005, she was at the hospital with the defendant's daughter when the defendant telephoned and asked her to leave the hospital, go to the defendant's residence, and remove the puppies. Case said she did not comply with the defendant's request.

Taz Farmer, the probation and parole officer assigned to supervise the defendant, testified that on February 3, 2005, he and fellow probation officer Marta Parsons went to inspect the defendant's home. The defendant initially refused them access to a locked room in the home, claiming that she did not have a key. However, after a lengthy delay and several conversations with her lawyer, the defendant ultimately produced the key. Inside the room, Farmer found one adult Maltese in a cardboard box and, hidden beneath a sleeping bag, a small wire cage containing a second adult Maltese and a nursing puppy. Farmer testified that he was confident he saw at least one nursing puppy, but there may have been a second puppy present as well.

The defendant testified that "Bubbles," one of only five dogs she had kept in her home since September 2004, had inadvertently been impregnated by a neighbor's Maltese mix. She claimed, however, that it was not Bubbles' puppies that Farmer had seen in the home, but instead a small stuffed animal toy that was in the cage with the adult Maltese. She said that she was aware of the court's order requiring her to have all her animals sterilized but assumed that Bubbles had been spayed because of the recent abdominal scar and sutures she observed on the dog when animal control returned her. She denied that she had engaged in any breeding or commercial activity involving animals since sentencing in the case and said she no longer had any dogs because someone had stolen them from her home a few days prior to the hearing. When questioned by the trial court, she acknowledged that there had been no signs of forced entry to the home and that she had not reported the burglary to the police.

Eddie Whitaker testified that, since sentencing in the case, he had not seen the defendant engage in any commercial activity involving animals.

The trial court accredited the testimony of the State's witnesses over that of the defendant and her witness. In making its findings, the trial court stated:

> I find that this mysterious burglary of the dogs is totally unbelievable. I find [the defendant] to be cold and calculating and that you intentionally violated the conditions of your supervisory bond that you would not have any other dogs at your residence other than the five that I permitted you to have and that you went forward and continued to engage in the business of breeding and selling these dogs after I specifically told you not to do it. Therefore, your bond is revoked.

The trial court characterized as "absurd and totally unbelievable" the defendant's

claim that Farmer had mistaken a stuffed toy for a live puppy. Accordingly, on February 15, 2005, the trial court entered a written order revoking the defendant's supervisory bond and ordering her incarceration in the Williamson County Jail to serve her ten-day sentence.

On March 30, 2005, the trial court entered an "Order on Petition for Writ of Habeas Corpus," declaring that the portion of the defendant's sentence to be served in confinement had expired and ordering that the defendant's previously filed bail bond be reinstated pending appeal. All prior conditions of the bail bond were placed in effect, with the exception that the defendant was ordered not to own or possess any animal during the time she was at liberty on bail.

## *ANALYSIS*

### I. Multiplicity of Presentment

As her first issue, the defendant contends that counts 1 through 28 of the presentment, which "allege acts or omissions involving fourteen (14) dogs and cats, all of which ... are alleged to have taken place on January 22, 2004," are multiplicitious because the animal cruelty statute is ambiguous as to "whether a defendant's alleged actions or omissions which simultaneously have an adverse effect on multiple animals constitutes one offense or multiple offenses for the purposes of [the] statute." She asserts that because the animals were kept in conditions that were "common to all," this court should either modify her multiple convictions to reflect a single conviction or remand for a new trial with the State required to elect the single offense upon which it wishes to proceed. In response, the State argues that the statute unambiguously states that each defined act of cruelty to an animal constitutes a separate offense. The State further argues that the proof at trial clearly showed that

each pair of counts in the presentment involved a distinct animal with its own distinct and separate injuries.

 The issue of multiplicity "concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." *State v. Phillips,* 924 S.W.2d 662, 665 (Tenn.1996) (footnote omitted). As set out by our supreme court in *Phillips,* the following principles must be examined when determining whether a defendant has received multiple punishments for the same offense:

1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;

2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitious; and

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

*Id.* at 665 (footnotes omitted).

Counts 1 through 28 of the presentment charged the defendant with animal cruelty for having tortured or maimed or failed to provide necessary food, water, care, or shelter to fourteen separate dogs and cats in her custody. Each animal was identified in the presentment by reference to its species, breed, and tag or cage number, and separate proof was presented at trial, which we have set out in detail previously, as to the distinct and separate injuries suffered by each animal. Because each count of the presentment required proof of a fact not required in proving the others, the convictions were not multiplicitious.

 Under the definition section of the animal cruelty statute, each individual animal tortured or maimed by a defendant, or

for which the defendant has unreasonably failed to provide necessary food, water, care, or shelter, may form the basis for a separate conviction. The animal cruelty statute provides that a person commits the offense of cruelty to animals who intentionally or knowingly:

(1) Tortures, maims or grossly overworks *an animal;*

(2) Fails unreasonably to provide necessary food, water, care or shelter for *an animal* in the person's custody;

(3) Abandons unreasonably *an animal* in the person's custody;

(4) Transports or confines *an animal* in a cruel manner; or

(5) Inflicts burns, cuts, lacerations, or other injuries or pain, by any method, including blistering compounds, to the legs or hooves of horses in order to make them sore for any purpose, including, but not limited to, competition in horse shows and similar events.

Tenn.Code Ann. § 39–14–202(a) (2003) (emphasis added).

Subsection (d) of the statute, on which the defendant relies for her argument that the statute is ambiguous, reads in part:

In addition to the penalty imposed in subsection (f), the court making the sentencing determination for a person convicted under this section shall order the person convicted to surrender custody and forfeit *the animal or animals* whose treatment was the basis of the conviction.

Tenn.Code Ann. § 39–14–202(d) (emphasis added). Citing other animal cruelty cases in which multiple animals formed the basis for a single conviction for animal cruelty, *see State v. Roy Edward Tolliver, Jr.,* No. E2003–02886–CCA–R3–CD, 2005 WL 737090 (Tenn.Crim.App. Apr.1, 2005); *State v. Judy Johnson and Stanley Johnson,* No. W2001–01272–CCA–R3–CD, 2002 WL 1426547 (Tenn.Crim.App. June 26, 2002), the defendant argues that the "variety in the way that various defendant[s] have been charged evinces ambiguity in the statutory language as to whether the legislature intended inappropriate conduct toward several animals simultaneously to constitute a single offense or multiple offenses." We respectfully disagree.

■ A court's role in construing a statute is to ascertain and give effect to legislative intent. *State v. Goodman,* 90 S.W.3d 557, 563–64 (Tenn.2002); *State v. Flemming,* 19 S.W.3d 195, 197 (Tenn. 2000). Whenever possible, legislative intent is to be ascertained from the natural and ordinary meaning of the language used. *Flemming,* 19 S.W.3d at 197; *Carson Creek Vacation Resorts, Inc. v. State, Dep't of Revenue,* 865 S.W.2d 1, 2 (Tenn. 1993). "The legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of statutory language, without a forced or subtle interpretation that would limit or extend the statute's application." *State v. Blackstock,* 19 S.W.3d 200, 210 (Tenn.2000) (citing *State v. Pettus,* 986 S.W.2d 540, 544 (Tenn. 1999)). If the language of a statute is not ambiguous, we may apply the plain language of the statute to resolve the issue. *Goodman,* 90 S.W.3d at 563–64; *Lipscomb v. Doe,* 32 S.W.3d 840, 844 (Tenn.2000).

Under the plain language of subsection (a) of the statute, a person commits "an offense" who tortures or maims "an animal" or fails unreasonably to provide necessary food, water, care, or shelter to "an animal" in his or her custody. We agree with the State that the use of the plural in the separate penalty provision in subsection (d) does not create any ambiguity in the definition of the offense in subsection (a), which clearly provides that a single animal may form the basis for an offense. Accordingly, we conclude that the counts

of the presentment are not multiplicitious and the defendant is not entitled to relief on the basis of this issue.

## II. Vagueness Challenge to Statute

 The defendant next contends that the animal cruelty statute is unconstitutionally vague as applied in her case. As the defendant recognizes in her brief, this court rejected a vagueness challenge to the constitutionality of the animal cruelty statute in *State v. Webb*, 130 S.W.3d 799 (Tenn.Crim.App.2003), concluding that the language of the statute was sufficiently specific to inform defendants of the proscribed conduct:

> Challenges of vagueness must be examined in light of the complaining party's conduct and the facts of the case at hand. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). A statute is not invalid simply because it may be arguably vague in a hypothetical instance but is clearly applicable to the complaining party. *See id.* Courts must indulge every presumption in favor of validity and resolve any doubt in favor of the constitutionality of a statute. *See State v. Chavis*, 617 S.W.2d 903, 905 (Tenn. Crim.App.1980). The fact that a statute applies in a wide variety of situations and must necessarily use words of general meaning does not render it unconstitutionally vague. *See State v. Lyons*, 802 S.W.2d 590, 592 (Tenn.1990).
>
> We conclude that Tennessee Code Annotated section 39–14–202(a)(2) is sufficiently specific to warn the defendants of the proscribed conduct, and, accordingly, this assignment is without merit.

*Id.* at 828.

 Here, the defendant argues that the statute was unconstitutionally vague as applied in her case due to its arbitrary and capricious enforcement, as evidenced by the fact that she was indicted on only thirty counts of animal cruelty when she "was in possession of hundreds of animals, kept under conditions which were common to all." The State responds by arguing, *inter alia*, that not all of the defendant's animals were kept under the same conditions and that it was within the prosecutor's broad discretion to choose which charges to bring against the defendant. We agree with the State.

 The decision of whether to prosecute and what charges to bring against an accused rests solely within the discretion of the prosecutor. *See State v. Spradlin*, 12 S.W.3d 432, 436 (Tenn.2000) (citations omitted). At a pretrial hearing, the prosecutor explained that, as a matter of judicial economy, the district attorney's office had indicted the defendant on only thirty counts of animal cruelty. That this was a legitimate concern is made abundantly clear by the voluminous record generated in this case, which consists of almost 1900 pages of trial transcript alone.

 Prosecutors in other animal cruelty cases involving an excessive number of animals have chosen to consolidate several animals together as the basis for each count of animal cruelty. For example, the defendants in *Judy Johnson and Stanley Johnson*, who were keeping approximately 350 dogs in a kennel in Gibson County, were charged with single counts of animal cruelty based on their treatment of all dogs of a particular breed housed in their kennel area, such that all Scottish Terriers within the kennel formed the basis for one count of animal cruelty, all Poodles within the kennel formed the basis for a second count, and so forth. 2002 WL 1426547, at *4–5. Such decisions constitute legitimate exercises of a prosecutor's discretion and do not equate to the arbitrary and capri-

cious enforcement of the statute. When determining the length and manner of service of a sentence in an animal cruelty case, a trial court may consider all the circumstances resulting in the convictions, including the total number of animals in the defendant's custody and the conditions under which they were living.

We conclude that the defendant is not entitled to relief on the basis of this issue.

### III. Sufficiency of the Presentment

The defendant next contends that the presentment was insufficient to put her on notice of the charges because it failed to state the specific facts constituting the offenses. The State responds by arguing that the presentment met the constitutional and statutory requirements of providing notice to the accused of the charges against her.

An indictment or presentment must inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition, Tennessee Code Annotated section 40–13–202 requires that an indictment

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

■ An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds,* 30 S.W.3d 294, 300 (Tenn.2000). Our supreme court has held that an indictment is sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial

court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." *Id.* at 299 (citing *State v. Hill,* 954 S.W.2d 725, 727 (Tenn.1997)).

■ We agree with the State that the presentment in this case clearly was sufficient to provide notice to the defendant of the charges against her. For example, count 1 of the presentment charged the defendant as follows:

> The Grand Jurors for Williamson County, Tennessee, duly impaneled and sworn, upon their oath, present that JENNIFER SILISKI, heretofore, to-wit, on January 22, 2004, before the finding of this indictment, in said County and State, unlawfully and knowingly did fail unreasonably to provide necessary food, water, care or shelter for a Maltese dog, tagged VI, an animal in said defendant's custody, in violation of Tennessee Code Annotated 39–14–202, a class A misdemeanor, and against the peace and dignity of the State of Tennessee.

Count 2 charged:

> The Grand Jurors for Williamson County, Tennessee, duly impaneled and sworn, upon their oath, present that JENNIFER SILISKI, heretofore, to-wit, on January 22, 2004, before the finding of this indictment, in said County and State, unlawfully did torture or maim an animal, to-wit: a Maltese dog, tagged VI, in violation of Tennessee Code Annotated 39–14–202, a class A misdemeanor, and against the peace and dignity of the State of Tennessee.

■ Each count of the presentment identified the individual animal by species, breed, and cage or tag number, provided the date and location of the offense, referenced the applicable statute, and set out the particular subsection of the statute

under which the defendant was being charged. This was sufficient to achieve the overriding purpose of providing notice to the defendant of the charges against her. Contrary to the defendant's assertion, the State was not required to list the precise facts on which it intended to rely to prove each count of the presentment. We conclude, therefore, that the defendant is not entitled to relief on this issue.

## IV. Denial of Motion to Suppress

The defendant next contends that the trial court erred in denying her motion to suppress the results of the search warrant, arguing that the supporting affidavit failed to establish probable cause for the search.[3]

 When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith,* 978 S.W.2d 861, 864 (Tenn.1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *See id.* However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo. See State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997).

 Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable cause, which has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Henning,* 975 S.W.2d 290, 294 (Tenn.1998). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." *Id.* A finding of probable cause made by an issuing magistrate is entitled to great deference. *State v. Yeomans,* 10 S.W.3d 293, 296 (Tenn.Crim.App.1999) (citing *State v. Melson,* 638 S.W.2d 342, 357 (Tenn.1982)). Therefore, the standard to be employed in reviewing the issuance of a search warrant is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." *State v. Meeks,* 876 S.W.2d 121, 124 (Tenn.Crim. App.1993).

 Investigator Brown's affidavit in support of the search warrant states, among other things, that he was notified by Debbie Leddy of Williamson County Animal Control that a number of complaints had been made about the manner in which the defendant housed and bred her animals. Specifically, Leddy told him that Karen Burnham, one of the defendant's kennel workers, had complained about the "filthy and substandard conditions" in the kennels. Leddy also told him that she had received similar complaints from Mary Pat Boatfield of the Nashville

---

3. The defendant recognizes that she failed to introduce either the search warrant or affidavit as exhibits at the suppression hearing. However, she argues that this court should nonetheless review the issue on its merits because there is no question that the documents, which are included in the technical record as attachments to her motion to sup- press, are the same ones that the trial court considered in its ruling. We agree. *See State v. Smotherman,* 201 S.W.3d 657, 661 (Tenn. 2006); *State v. Bobadilla,* 181 S.W.3d 641, 643 (Tenn.2005) (holding that failure to enter search warrant and affidavit into evidence at suppression hearing did not preclude review of the suppression issues raised on appeal).

Humane Association, Jessica Hardin of the Better Business Bureau, and Michelle Elliot, a consumer affairs staff attorney with the Department of Commerce and Insurance. Investigator Brown stated that he and Leddy arrived at the defendant's residence at 10:30 a.m. on January 22, 2004, approximately ten minutes after a Williamson County sheriff's deputy had witnessed the defendant arrive in her vehicle and enter the residence. He then described in the affidavit their unsuccessful attempts to get the defendant to answer her door:

Leddy knocked on the door of the residence and announced who she was. Leddy has met with the suspect on multiple occasions prior on similar complaints. Jennifer S. Siliski never answered the door. Leddy knocked on the door and announced her presence for approximately 10–15 minutes. Leddy and the affiant proceeded to the rear of the home to knock on the back door. In so doing they passed by the windows of the converted garage where the animals were housed. They heard the barking of scores of dogs and saw animals in cages. A foul and noxious odor was apparent from a range of approximately 10 feet.

In the affidavit, Investigator Brown further stated that Karen Burnham contacted him directly at 12:20 p.m. that same day and provided the following information:

Burnham informed the affiant that Leddy called her and asked her to contact him. Burnham stated that she was formerly employed by the suspect to clean up the kennels and had worked for her for approximately 2½ years. She only worked on weekends. She quit January 18, 2004 because the working conditions were unacceptable and because she was underpaid.

Burnham observed between 160 and 200 animals housed there on the 18th, with 63 cages in the garage lodging 2–3 animals in most cages. She stated that the house was always in a state of disrepair with dog feces and urine pervasive. She described the home as a "hellhole" and asserted that it was filthy. She stated that the stench was noxious and overpowering and could never be cleansed. Burnham had twice witnessed persons become physically ill when inhaling the smell. Burnham informed the affiant that she never saw the suspect care for the animals and that they were unattended unless she or her sister, Julie, who was also a former cleaner, were there. She described the animals as matted and unwashed and said many of them had ear infections that were uncared for to the point that their eardrums had ruptured. She stated that over the course of the weekend of January 17–18, the suspect had allowed a newly born litter of puppies to starve to death. Burnham believed that the state of the animals was noticeably worse than inhumane conditions she had observed in programs displaying animal cruelty on television. She believed the suspect was "in over her head" and that the conditions could only have worsened since she quit.

The defendant argues that this affidavit was insufficient to establish probable cause for the search because, by her view, there was no nexus established between the condition of the defendant's home and animals on January 22, 2004, and the general complaints that Leddy had received from the representatives of the Nashville Humane Association, Better Business Bureau, and the Department of Commerce and Insurance; Leddy and Brown engaged in an unlawful search when they walked to the defendant's back door, in the process passing the garage where Brown smelled the noxious odor and saw the caged animals; and the affidavit did not establish the relia-

bility of the information provided by Karen Burnham who, according to the defendant, clearly had "an axe to grind against [her]" and therefore should not have been considered as inherently reliable as a "pure 'citizen informant.'" We will review these claims, noting first that the defendant presented no witnesses or affidavits in support of her motion to suppress but relied entirely upon perceived infirmities in the warrant itself.

In denying the motion to suppress, the trial court found, among other things, that Karen Burnham was a citizen informant whose credibility did not have to be established by the State. The defendant argues to the contrary.

■ Our courts have traditionally distinguished between information in an affidavit provided by a "citizen informant," which is presumed to be reliable, and information provided by a "criminal informant," which must be supported by facts showing both the basis for the criminal informant's knowledge and the credibility of the informant or the reliability of the information. *State v. Williams*, 193 S.W.3d 502, 507 (Tenn.2006) (citing *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn.1999); *State v. Melson*, 638 S.W.2d 342, 354 (Tenn.1982); *State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn.1989)). In *Williams*, our supreme court recognized that information may also be provided by someone who is neither a criminal informant nor a pure citizen informant, but is instead motivated to inform on a suspect out of personal bias or revenge. *Id.* at 507–08. In such cases, absent "additional particularized information in the affidavit" to bolster or corroborate that the information was supplied by a concerned citizen informant, the affidavit must satisfy the two-pronged "basis of information" and "reliability" test for information supplied by a criminal informant. *Id.* (citing *Stevens*, 989 S.W.2d at 294–95).

■ Unlike the informant in *Williams*, who provided information to police about her boyfriend's possession of cocaine only after she herself had been arrested for domestic assault, Karen Burnham independently contacted Debbie Leddy to report the state of the defendant's kennels and animals. According to the affidavit, she had not been fired but instead quit on January 18, 2004, because of the unacceptable working conditions and low pay. The affidavit further states that Burnham thought the state of the defendant's animals was noticeably worse than those she had seen in television programs depicting animal cruelty; reported that she and her sister, also a former kennel worker, were the only ones who ever did anything for the animals; and believed the conditions in the kennels could only have worsened in the days since she had quit.

On appeal, the defendant argues that "[t]his information suggests that [Burnham], at the time she gave the information, had an axe to grind against the Defendant." This is sheer speculation. There is no basis for our concluding that an employee who feels she is underpaid and called to work in unacceptable conditions automatically has an "axe to grind." The defendant might have established this through Burnham's testimony at the hearing on the motion to suppress, but she was not called. Accordingly, we conclude that the record supports the determination of the trial court that Burnham was a citizen informant and, thus, presumed to be reliable.

Additionally, the defendant argues on appeal that Brown and Leddy illegally went to the rear of the defendant's property, where they heard dogs barking and smelled a foul odor:

The affidavit indicates that it was not until Mr. Brown and Ms. Leddy "pro-

ceeded to the rear of the home to knock on the back door" and thereby invaded a private area of the Defendant's home that they heard barking, saw animals in cages and smelled "[a] foul and noxious odor." These sensory observations, which resulted from an unreasonable search, should accordingly be excluded from the determination of whether the affidavit made out probable cause. With this information redacted, the remaining observations of affiant Mr. Brown and his cohort Ms. Leddy contribute nothing to probable cause.

The problem with this argument is that, as were the claims that Burnham had "an axe to grind against the Defendant," no witnesses testified as to the layout of the defendant's house or property, clarifying, for instance, whether this additional area was open to the public, as was the front door. As to this matter, the trial court, not surprisingly, made no findings of fact, for the defendant relied solely upon her view that officers had no right to walk down her driveway to knock on the back door.[4] However, this is an incomplete statement of the law. As explained in Wayne R. LaFave, *Search and Seizure*, § 2.3(c) (4th ed.2004), officers may, under certain circumstances, lawfully enter into the curtilage of a house:

> Thus, courts have held "that police with legitimate business may enter the areas of the curtilage which are impliedly open to use by the public," and that in so doing they "are free to keep their eyes open and use their other senses." This means, therefore, that if police utilize "normal means of access to and egress from the house" for some legitimate purpose, such as to make inquiries of the

occupant, to serve a subpoena, or to introduce an undercover agent into the activities occurring there, it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling.

*Id.* (footnotes omitted). *See, e.g., State v. Glines*, 134 Or.App. 21, 894 P.2d 516, 518 (1995) (officer properly went to side door to knock on door where "side entry is about eight feet from the front wall of defendant's house" and "adjacent to a common driveway that defendant shares with his neighbor, is visible from the public sidewalk and is equipped with a doorbell").

■ Additionally, the defendant argues on appeal that the information in the search warrant that "similar complaints" as to the poor conditions of the kennels had been received from employees of the Nashville Humane Association, the Better Business Bureau, and the Department of Commerce and Insurance could not supply probable cause for the warrant because it failed to specify when this information was received or the bases of knowledge of these three persons. We agree, for the affidavit fails to establish that this information was not stale. However, since probable cause otherwise was established by the search warrant, as we have set out, our conclusion as to this one claim does not avail the defendant. *See State v. Ash*, 729 S.W.2d 275, 278 (Tenn.Crim.App.1986). Moreover, even if it could have been shown that the informant did not give reliable information, if there is a showing on the face of the affidavit that there was probable cause to issue the search warrant, the magistrate's action is not subject to review. *Solomon v. State*, 203 Tenn. 583,

4. The trial court found that the officer "knocked on the front door, and they walked around to the back door," and that "they didn't do anything ... beyond what a reason-

ably, respectable citizen would do." However, no proof was presented as to the layout of the house or whether the back door was situated so as to be open to the public.

315 S.W.2d 99 (1958); *State v. Kuneff,* 291 Mont. 474, 970 P.2d 556, 559 (1998) (when the issuance of a search warrant is based in part on illegal information, the reviewing court shall excise the illegally obtained information from the application for search warrant and review the remaining information *de novo* to determine whether probable cause supported the issuance of a search warrant).

The record supports the determination of the trial court as to the search warrant.

## V. Admission of Veterinarian's Report

■ The defendant next contends that the trial court erroneously admitted, under the business records exception to the rule against hearsay, a report prepared by Dr. Fooshee. Since "[t]he determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court," *State v. Stout,* 46 S.W.3d 689, 697 (Tenn.2001), we will not reverse the trial court's ruling on this issue absent a clear showing of an abuse of discretion.

Tennessee Rule of Evidence 803(6), the business records exception to the hearsay rule, provides as follows:

Records of Regularly Conducted Activity.—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting cer-

tification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

■ The defendant asserts that at the time the report was admitted, "no employment relationship or other association between Dr. Fooshee and any business entity or agency was in evidence" and that "[n]o evidence had then been adduced as to what activities any business with which Dr. Fooshee was associated conducts, regularly or otherwise." We respectfully disagree. Dr. Fooshee, who was accepted by the trial court as an expert witness in the area of veterinary medicine, testified that she recorded the conditions in which she found the animals on January 22, 2004, and prepared a report based on her notes. She further testified that she had a business duty to record the information and had kept and maintained the record in the regular course of her business.

At the point at which the report was admitted, Dr. Fooshee had not yet testified that she had been employed as a veterinarian by Williamson County Animal Control, a fact which was brought out on cross-examination. However, it was abundantly clear from her direct examination testimony that her business was veterinary medicine. In addition, she signed the report as "Mary E. Fooshee, D.V.M., Consulting Veterinarian, Williamson County Animal Control." Furthermore, the trial court referred to her as the veterinarian for Williamson County Animal Control in its August 24, 2004, order granting the defendant's motion to suppress evidence of the ketamine and various other medications, surgical stapler, and tattoo gun seized from the residence. We, therefore,

find no abuse of discretion on the part of the trial court in admitting the report into evidence.[5]

## VI. Defendant's Waiver of Right to Testify

The defendant next contends that the colloquy between herself and trial counsel regarding her right to testify failed to satisfy the requirements of *Momon v. State*, 18 S.W.3d 152 (Tenn.1999). In *Momon*, our supreme court held that the right of a defendant to testify in his or her own behalf is a fundamental constitutional right that must be personally waived by the defendant. *Id.* at 161. To ensure that the defendant has personally waived that right, "defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify." *Id.* at 162. No particular litany need be used; however, defense counsel must at a minimum show "that the defendant knows and understands that":

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily

and personally waived the right to testify.

*Id.* at 162. These procedures are "prophylactic measures which are not themselves constitutionally required." *Id.* at 163. Therefore, the failure to follow the above guidelines will not be enough to show that a defendant was deprived of the constitutional right to testify "if there is evidence in the record to establish that the right was otherwise personally waived by the defendant." *Id.*

In this matter, defense counsel questioned the defendant as to whether she wished to testify:

THE COURT: ... [Defense counsel], if you would, I want you to just for the record talk to [the defendant] about taking the stand or not taking the stand. Ms. Siliski, could you raise your right hand?

[DEFENSE COUNSEL]: You are Jennifer Siliski?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And Ms. Siliski, you have been informed of your right to testify in this case?

[DEFENDANT]: Yes, ma'am.

[DEFENSE COUNSEL]: And have you chosen not to exercise that right?

[DEFENDANT]: Yes, ma'am.

[DEFENSE COUNSEL]: You freely and voluntarily waive the right to testify in your own defense in this matter?

[DEFENDANT]: Yes, ma'am.

THE COURT: All right. Very good.

In this exchange, the defendant affirmed that she had been "informed of [her] right to testify" and that she was freely and

---

5. We further note that the report, which describes the conditions of the kennels and the animals, does not contain any information different from that presented at trial through the testimony of Dr. Fooshee and other wit-

nesses who participated in the search. Thus, even if we had found that its admission was error, we would have concluded that it was harmless. *See* Tenn. R.Crim. P. 52(a).

voluntarily waiving that right. The record reveals that the defendant attended Northwestern and Duke Universities. Thus, she clearly is a well-educated and intelligent woman and, as such, was capable of understanding what she was doing when she decided not to testify in her own defense. Accordingly, we agree with the State that the defendant's waiver was made knowingly, voluntarily, and intelligently.

 Furthermore, even if we found that the colloquy did not meet the minimal *Momon* requirements, we would nonetheless conclude that the error was harmless beyond a reasonable doubt. As the *Momon* court stated:

> [C]ourts should consider the following factors when determining whether the denial of the right to testify is harmless beyond a reasonable doubt: (1) the importance of the defendant's testimony to the defense case; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; (4) the overall strength of the prosecution's case. As previously stated, the goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict. Accordingly, the factors identified herein are merely instructive and not exclusive considerations.

*Id.* at 168 (citation and footnote omitted).

The crux of the evidence against the defendant consisted of the photographs and videotape of the kennels and animals, as well as the testimony from the various witnesses who participated in the search of the residence. In response to this proof, the defendant presented witnesses who were intended to show that the conditions were of recent origin, were not as bad as they appeared on the videotape, and were caused by the kennel workers having quit without notice. The defendant also attempted to show that many of the animals had contracted their various illnesses and health conditions after their removal to Williamson County Animal Control. To this end, defense counsel vigorously cross-examined the State's witnesses about the evacuation, subsequent treatment, housing conditions, and recordkeeping procedures used with the animals. Defense counsel also presented witnesses on the defendant's behalf who testified about how much the defendant cared for the animals and the good conditions she maintained in her kennels. Thus, it appears that, through these witnesses, the defendant got her entire defense before the jury. She has not suggested otherwise.

Thus, even if the *Momon* requirements were not met, we would conclude that the error was harmless. Further, we note that it may have been a strategic decision that the defendant not testify and face cross-examination by the State. During opening argument, defense counsel described the defendant as "a very assertive" and "very aggressive woman" and conceded that she was not "the most likeable person."

The defendant is not entitled to relief on the basis of this issue.

## VII. Consecutive Periods of Probation

 As her next issue, the defendant contends, and the State concedes, that the trial court erred by ordering consecutive periods of probation in conjunction with concurrent sentences. The State submits, however, that because the consecutive periods of probation formed such a significant portion of the original sentence, this court should remand "to allow the trial court the opportunity to fashion a sentence appropriate to achieve its stated goals of deterrence for others and punishment of

the defendant, who has shown no remorse for her crimes."

Appellate review of misdemeanor sentencing is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40–35–401(d),–402(d). This presumption of correctness is conditioned upon the affirmative showing that the trial court considered the relevant facts, circumstances, and sentencing principles. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is on the appealing party to show that the sentence is improper. *See* Tenn.Code Ann. § 40–35–401(d), Sentencing Commission Comments.

When imposing a misdemeanor sentence, the trial court is not required to conduct a sentencing hearing but must afford the parties a reasonable opportunity to address the length and manner of service of the sentence. Tenn.Code Ann. § 40–35–302(a). The trial court has the authority to place the defendant on probation either immediately or after a time of periodic or continuous confinement. Tenn. Code Ann. § 40–35–302(e). In determining the percentage of the sentence to be served in actual confinement, the court must consider the principles of sentencing and the appropriate enhancement and mitigating factors and must not impose such percentages arbitrarily. Tenn.Code Ann. § 40–35–302(d).

In *State v. Connors*, 924 S.W.2d 362, 364 (Tenn.Crim.App.1996), *overruled on other grounds by State v. Troutman*, 979 S.W.2d 271 (Tenn.1998), this court concluded that consecutive periods of probation are impermissible when the sentences themselves are to be served concurrently:

> The term "sentence" includes both the period of incarceration and the period of probation. Thus, if the trial court orders the defendant's sentences to run consecutively, then each portion of his sentences must be so served. Likewise, if the defendant is ordered to serve his sentences concurrently, his periods of probation will also run concurrently. The Sentencing Act makes no provision for ordering different portions of the same sentence to run in different manners.

We, therefore, reverse the trial court's imposition of consecutive periods of probation. Because a lengthy probationary period was an important part of the trial court's rationale in determining the defendant's total sentence, we remand this matter to the trial court for resentencing.

## VIII. Permanent Prohibition Against Commercial Activity Involving Animals

The defendant contends that the trial court's permanent prohibition against her buying, selling, breeding, or engaging in any commercial activity involving animals is unreasonable. The State argues that the permanent prohibition is a reasonable restriction on the defendant's custody of animals as authorized by the animal cruelty statute, which provides in pertinent part:

> In addition to the penalty imposed in subsection (f), the court making the sentencing determination ... may prohibit the person convicted from having custody of other animals for any period of time the court determines to be reasonable, or *impose any other reasonable restrictions on the person's custody of animals as necessary for the protection of the animals.*

Tenn.Code Ann. § 39–14–202(d) (2003 & 2006) (emphasis added).

In support of her argument that the permanent prohibition imposed by the trial court is too harsh, the defendant points out that the defendants in *Webb*, 130 S.W.3d at

803, were prohibited from owning animals for a period of only ten years. She also cites *State v. Patricia Adkisson,* Nos. M2000–01079–CCA–R3–CD, M2000–02319–CCA–R3–CD, 2001 WL 1218570, at *9 (Tenn.Crim.App. Oct.12, 2001), in which this court stated that "[n]o conditions of probation, such as the prohibition against dog ownership, could have extended beyond the term of the sentence." However, as the State in turn points out, the permanent prohibition in this case was directed at the defendant's *commercial activity,* not ownership of animals, and was imposed pursuant to the provisions of the animal cruelty statute, not as a condition of probation.[6]

In reviewing this issue, we will recount relevant testimony and proof previously set out.

 Pat Corzale, one of the defense witnesses at trial, testified that the defendant did not believe she had broken any law. The defendant's view of her conduct contrasts sharply with the testimony of State's witnesses as to the squalid conditions in which she kept the animals and her expressed intent to breed the maximum number of puppies, regardless of the condition or age of her dogs and the health risks resulting from the breeding. The defendant's psychological report, submitted with her application for pretrial diversion, stated that she "suffered from perceptional distortion and narcissistic personality disorder with histrionic elements." At the defendant's bond revocation hearing, there was testimony that she was continuing, despite a court order that she not do so, the commercial breeding of puppies; that, by initially denying her probation officer access to a room in her house, she tried to hide this fact; that she

claimed the probation officer had mistaken a stuffed toy for a puppy; and that she claimed all of her dogs had been stolen several days before the revocation hearing during a burglary not previously reported. As to all of this, the trial court found the "mysterious burglary of the dogs [was] totally unbelievable"; that the defendant was "cold and calculating and . . . intentionally violated the conditions of [her] supervisory bond"; and that she "continued to engage in the business of breeding and selling . . . dogs after [the court] specifically told [her] not to do it."

Given this proof and the court's findings, we cannot conclude that the trial court erred in ordering that the defendant be permanently barred from engaging in commercial activity with respect to dogs. Considering the defendant's inability to appreciate that she was treating dogs cruelly, her continuing, in violation of a court order, to breed dogs, and her willingness to lie to the court, we have no basis to conclude that, after a term of years we would arbitrarily select, the defendant would be any more willing to act lawfully than she is now. Accordingly, we conclude that the record supports the trial court's permanent ban from commercial activity.

## IX. Jurisdiction to Amend Sentence

 As her last issue, the defendant contends that the trial court lacked jurisdiction to amend her sentence after entry of the original September 23, 2004, judgment. She asserts that her prematurely filed *pro se* notice of appeal took effect on September 23, 2004, pursuant to Rule 4(d) of the Tennessee Rules of Appellate Procedure, which states: "A prematurely filed notice of appeal shall be treated as filed

---

**6.** Although the defendant's probation report lists the permanent prohibition as a special condition of probation, the trial court's sentencing order specifically states that the condition is imposed "[p]ursuant to the Animal Cruelty statute."

after the entry of the judgment from which the appeal is taken and on the day thereof." She argues that the trial court therefore lost jurisdiction over her case on that date, rendering all its subsequent orders void.[7] The State responds that the September 23 judgment was not the final judgment order because it failed to comply with Rule 17 of the Rules of the Tennessee Supreme Court or Tennessee Code Annotated section 40–35–209(e) and expressly left the issue of restitution to be resolved at a later date.

Tennessee Supreme Court Rule 17 states in pertinent part:

The judgment document shall be in the form provided and shall contain all of the information required by T.C.A. § 40–35–209(e). The judgment should be prepared for each conviction; if there are multiple convictions in the same indictment, separate judgments should be filled out with appropriate notations stating whether the sentences will run consecutively or concurrently. The date of the judgment shall be the date upon which the order of sentence was entered.

Tennessee Code Annotated section 40–35–209(e) provides that the district attorney general shall complete a uniform judgment document for each conviction which shall indicate, among other things, the type of offense for which the defendant was charged and convicted and the sentence imposed; the defendant's offender classification; the manner of service of the sentence; the amount, if any, of pretrial jail credit; the defendant's social security number and date of birth; and the date

the conviction offense was committed. Tenn.Code Ann. § 40–35–209(e) (2003).

We conclude that the September 23, 2004, "Judgment" entered by the trial court was a preliminary sentencing order and not a final judgment. It was not in the form of a uniform judgment document and did not contain much of the information required in a final judgment form. Moreover, the trial court specifically reserved the determination of the restitution owed to the county to a later date following an evidentiary hearing. We conclude, therefore, that the trial court retained jurisdiction to amend the sentencing order on October 8, 2004, pursuant to the agreement reached by the parties.

We further conclude that final judgment was not entered in the case until December 21, 2004, when the trial court entered the standard judgment forms for each count of the presentment. As such, the defendant's October 26, 2004, motion for new trial, like her notice of appeal,[8] was prematurely filed. However, the State did not raise the issue on appeal, and we can discern no prejudice caused to the State nor any reason why we should not have considered each of the defendant's issues on its merits. *See State v. Perry Saleem Lee,* No. 01C01–9806–CC–00266, 1999 WL 346196, at *5 (Tenn.Crim.App. June 2, 1999), *perm. to appeal denied* (Tenn. Nov. 22, 1999) (finding no prejudice to the State by defendant's premature motion for new trial and thus no reason that issues should not be addressed on appeal).

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the defendant's con-

---

7. The defendant recognizes that if the September 23, 2004, order is considered the final judgment in the case, her October 26, 2004, motion for a new trial would have been untimely, which would result in the waiver of all issues except sentencing and the sufficiency of the evidence.

8. Appellate defense counsel also filed a notice of appeal on February 2, 2005, following the trial court's February 2, 2005, entry of the order overruling the motion for new trial.

victions but conclude that the trial court erred by sentencing the defendant to concurrent sentences but consecutive terms of probation. Accordingly, we remand the case to the trial court for resentencing.