IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 15, 2011

## STATE OF TENNESSEE v. SAMUEL ALAN IRESON

**Appeal from the Criminal Court for Sullivan County**
**Nos. S55, 866     Robert H. Montgomery, Jr., Judge**

_____

**No. E2010-01648-CCA-R3-CD - Filed June 10, 2011**

_____

The Defendant, Samuel Alan Ireson, was convicted by a Sullivan County jury of voluntary manslaughter, fabrication of evidence, and employment of a firearm during the commission of a dangerous felony. The trial court sentenced the Defendant as a Range I, standard offender to consecutive terms of five years for the voluntary manslaughter conviction, five years for the fabrication of evidence conviction, and six years for the firearm conviction, resulting in an effective sentence of sixteen years in the Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions and several sentencing determinations made by the trial court—the length of his sentences for voluntary manslaughter and fabrication of evidence, the consecutive nature of his fabrication of evidence sentence, and the denial of judicial diversion. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Charles R. Martin, Kingsport, Tennessee, for the appellant, Samuel Alan Ireson.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Greeley Wells, District Attorney General; and William Harper, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

On April 11, 2008, the Defendant shot and killed the victim, James Guinn. The shooting occurred following the Defendant's termination of the victim's employment with the Defendant's moving company. Thereafter, the Defendant was charged by presentment with voluntary manslaughter, which was later amended to include employment of a firearm during the commission of a dangerous felony and fabrication of evidence. See Tenn. Code Ann. §§ 39-13-211, -16-503, & -17-1324. The Defendant's trial was held on October 14 through 16 of 2009.

The evidence presented at trial showed that the Defendant operated Kingsport Transfer Company, a moving company located in Sullivan County. On April 10, 2008, the victim, Harry David Guy, and Jerry Conner began working on a moving job. After not being able to finish on April 10, they returned to the residence on April 11 but were still unable to complete the job. The Defendant and the victim had been having words throughout the day. During a telephone conversation, the victim had hung up on the Defendant. The Defendant decided to fire the victim.

When Mr. Guy returned to Kingsport Transfer that evening, he saw the Defendant, the Defendant's wife, Angela Ireson, and Donnie Gibson, Mr. Guy's brother, standing around talking. The victim arrived three or four minutes later. The victim backed the truck in and got out. The Defendant and the victim began arguing, and the Defendant told the victim that he was fired. The Defendant asked the victim for his keys, and the victim asked Mr. Guy to get his bag of clothes and medication out of the truck. Mr. Guy and Mr. Gibson proceeded to the back of the truck to retrieve the victim's belongings. After Mr. Guy had opened the back doors of the truck, the Defendant and the victim came to the back of truck. Mr. Guy handed the victim his clothes and then handed his own belongings to Mr. Gibson. The Defendant and the victim again began to argue. Mr. Guy then heard "a slapping sound[,]" and turned to see the victim hitting the Defendant. He heard this sound three times. Mr. Guy was very close to the altercation and, as he was trying to move away from the two men, he heard a gunshot. The Defendant carried his gun everywhere in a holster on his side. Mr. Guy took off running after the gunshot. As he came running around the truck, the victim, who was on his hands and knees, with one hand to his chest, called his name. Mr. Guy went to the victim and promised he would not leave him. He then called 911. While Mr. Guy was with the victim, Mrs. Ireson brought him an article of clothing to place underneath the victim's head.

Mr. Gibson testified that the Defendant had been drinking beer earlier that day and that the Defendant "kept fussing" and fighting with the victim. He heard the Defendant say

to the victim, "Well, you don't have to worry about this gun let's just settle it down in the parking lot[.]" The victim responded, "We don't have to," and about that time, hit the Defendant.

Jerry Conner also observed the shooting. According to Mr. Conner, after the victim was fired, he wanted to get his bag and go. After hearing the gunshot, Mr. Conner heard Mrs. Ireson jump out and say "Samuel Ireson[,]" and the Defendant replied, "I don't give a God damn, there's no one gonna hit me." Mr. Conner got in his vehicle and drove to Charlene Soter's house.

Charlene Soter lived on the Kingsport Transfer property in April 2008. After hearing a commotion outside, she went to the window. She saw the Defendant's "arm go up," followed by a gunshot. The victim grabbed his chest and began running away, screaming "Oh, my God." Ms. Soter saw the Defendant, who always carried a weapon, emerge from around the side of the truck. Ms. Soter's daughter called 911.

Angela Ireson was also present on the scene. She testified that she heard the Defendant say, "You hit me. You hit me. Oh my God, you hit me again, what's in your hand." She then saw Mr. Guy come running from the front of the truck, and he said, "He had a fuckin' knife and Sam shot him." At the time, the victim also emerged from the back of the truck. She kept asking "where's Sam" and asked the victim to just lie down. According to Mrs. Ireson, after the victim fell down, he kept hitting his head on the pavement and screaming that he was going to "cut [Mrs. Ireson] up." Mrs. Ireson took her jacket off and put it behind the victim's head. Mr. Guy, who had called 911, told Mrs. Ireson and the Defendant to secure their weapon and have their permits available. Mrs. Ireson placed the gun in the Defendant's truck. The Defendant returned to his truck and drank a beer while he waited for the police to arrive.

After multiple calls to 911 from individuals at the scene, Sullivan County officers arrived at Kingsport Transfer Company. When the officers arrived at the scene, they drew their weapons in order to secure the area. Sullivan County Sheriff's Deputy, Tonya Price, patted the Defendant down for safety and placed him in the back of a patrol car. Deputy Price then went to check on the victim. She asked Mr. Guy to remove his shirt and placed it on the victim's wound to control the bleeding. The victim was in pain and frightened; he kept asking if he was going to live or die. The victim was transported to the hospital, where he later died from his wound.

Officers at the scene talked with the Defendant. He told them that the victim had a knife, and he wanted to show them where it was located. Detective Randy Simpson of the Sullivan County Sheriff's Office, Criminal Investigation Division, took a statement from the

Defendant. He let the Defendant read what he had written, and then the Defendant signed it. Detective Simpson also spoke with the Defendant's wife.

Mrs. Ireson testified that the Defendant had a handgun carry permit and always carried a weapon because he carried large sums of cash and would have to go to the storage units at all times of the day. The Defendant's .40 caliber semi-automatic pistol was found in the front seat of his pickup truck. The bullet recovered from the victim was matched to the Defendant's gun. Detective Simpson also recovered an Old Timer three-blade knife from the scene. According to Detective Simpson, one blade was in the open position, and the knife was not easy to open and close. No fingerprints were found on the knife, possibly due to the fact that it started raining shortly after the shooting.

Mr. Guy testified that he did not see the victim with a knife at the time of the shooting. In fact, according to Mr. Guy, he had never seen the victim with a knife. Mr. Guy stated that he was the only one who carried a knife to the jobs, and everyone would ask to borrow his knife. Mr. Richard Shirks, Mrs. Heather Guinn, the victim's wife, and Mr. Conner also testified that the victim never carried a knife at work. The Defendant's stepmother, Carolyn Ireson, testified that she once asked the victim to let her borrow his knife and that he stated that he did not carry one because he had gotten cut one time. Carolyn Ireson also stated that the Defendant carried a pistol on a regular basis and often used it to intimidate others; in fact, she had asked him not carry it, but he did anyway.

Ms. Soter testified that, on a prior occasion, she overheard the Defendant say that, if he ever shot someone, "[h]e would put a knife in their hand." According to Mr. Conner, the Defendant always carried a knife, and the Old Timer knife found at the scene was the same type of knife that the Defendant always carried. Mr. Shirks testified that the knife looked like one he had seen in the Defendant's truck. Contrary to all of this testimony, Mrs. Ireson testified that her husband did not routinely carry a knife and that she did not recognize the knife found at the scene as one belonging to her husband. The Defendant's son, Samuel Ireson, Jr., testified that he had never seen his father with the knife discovered at the scene.

The autopsy showed that it would not have been possible for the victim's left arm to have been extended out straight at the time he was shot "because the bullet would have to go in a circle" to cause a wound on the forearm and the arm with one shot. However, this would not have interfered with the victim's ability to hold an object in hand. Additionally, the autopsy showed that the bullet traveled in a downward direction as it entered the victim's body.

The Defendant testified on his own behalf and contradicted much of the testimony of the State's witnesses; according to the Defendant, he turned his head away from the victim

and, as he did so, the victim struck him in the face one or more times with a cell phone clutched in his right fist. The Defendant also offered three character witnesses on his behalf. They testified that the Defendant had a reputation for truthfulness in the community.

At conclusion of proof, the jury found the Defendant guilty as charged on all counts. The jury also fined the Defendant a total of $20,000.

A sentencing hearing was held on February 11, 2010. The trial court sentenced the Defendant, a Range I, standard offender, to six years for employment of a firearm during the commission of a dangerous felony, five years for voluntary manslaughter, and five years for fabrication of evidence. The trial court ordered all of the sentences to be served consecutively to one another, resulting in an effective sentence of sixteen years. The trial court denied the Defendant's request for any form of alternative sentencing, including judicial diversion.

The Defendant timely appealed. The case is properly before this Court.

## Analysis

### I. Sufficiency of the Evidence

The Defendant argues that the evidence presented at trial is insufficient to support his convictions. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557–58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual

issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant argues that the legislative history of the firearm statute indicates that the legislature only intended to criminally prosecute those unlawfully in possession of a firearm. That is, because he had a valid handgun carry permit, he would not be subject to criminal prosecution under the statute for employment of a firearm during the commission of a dangerous felony. As to the issue of guilt, the Defendant contends that the State did not "offer any direct evidence [(1)] that [the victim] did not move his hand forward toward the Defendant[,] . . . [(2)] that [the victim] did not have a knife in his hand when he moved his hand forward[,] and . . . [(3)] that the knife located as a result of the investigation belonged to the Defendant[.]" The State counters that the evidence is sufficient to support the Defendant's convictions.

First, addressing the Defendant's legislative history argument, we begin by noting that when examining a purely legal issue, such as statutory construction, Tennessee appellate courts adhere to a de novo standard with no presumption of correctness as to the lower court's conclusions of law. State v. Collins, 166 S.W.3d 721, 725 (Tenn. 2005) (citing State v. Wilson, 132 S.W.3d 340, 341 (Tenn. 2004)). The Tennessee Supreme Court has ruled that "[t]he most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). With this in mind, the first step in determining legislative intent is to determine whether the statutory language itself is ambiguous. If it is not, we are limited to the plain meaning of the statutory language.

We are instructed by our highest court to "initially look to the language of the statute itself in determining the intent of the legislature. Courts are restricted to the natural and ordinary meaning of the language used by the legislature in the statute, unless an ambiguity requires resort elsewhere to ascertain legislative intent." Browder v. Morrs, 975 S.W.2d 308, 311 (Tenn. 1998) (citing Austin v. Memphis Pub. Co., 655 S.W.2d 146, 148 (Tenn. 1983)). Appellate courts must "assume that the legislature used each word in the statute purposely, and that the use of these words conveys some intent and has a meaning and purpose." Id. (citing Locust v. State, 912 S.W.2d 716, 718 (Tenn. Ct. App. 1995)). Thus, "[w]here the words of the statute are clear and plain and fully express the legislature's intent, there is no room to resort to auxiliary rules of construction, and we need only enforce that statute as written." Id. (citing In re Conservatorship of Clayton, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995) and Roberson v. Univ. of Tennessee, 912 S.W.2d 746, 747 (Tenn. Ct. App. 1995)).

Tennessee Code Annotated section 39-17-1324 states, in pertinent part,

> (a) It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony.
>
> (b) It is an offense to employ a firearm during the:
> (1) Commission of a dangerous felony; [or]
> (2) Attempt to commit a dangerous felony[.]

Tenn. Code Ann. § 39-17-1324(a), (b). Voluntary manslaughter qualifies as a dangerous felony for purposes of this section. Tenn. Code Ann. § 39-17-1324(i)(1).

The indictment charging the Defendant tracks the language of subsection (b).[1] Subsection (b) criminalizes the employment of a firearm during the commission of a dangerous felony, only subsection (a) uses the term "possess." Under the plain language of subsection (b), to employ or use a firearm in the commission of dangerous felony is a criminal offense. Moreover, the plain language of subsection (a) does not evidence a legislative intent to differentiate between lawful or unlawful possession of a firearm. The Defendant does not dispute that he possessed a handgun or used it to shoot the victim. Despite the great pains the Defendant goes through to convince this Court that the legislature did not intend to criminalize lawful possession of a firearm, there is no need to resort to the statute's legislative history because the natural and ordinary meaning of the statute is not ambiguous. See State v. Siliski, 238 S.W.3d 338, 362 (Tenn. Crim. App. 2007).

As to the issue of guilt, voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person acts knowingly "when the person is aware that [their] conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). The Defendant was also convicted of fabrication of evidence. As charged, Tennessee law states that it is "unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [m]ake, present, or use any record, document or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding." Tenn. Code Ann. § 39-16-503(a)(2).

---

[1] The jury instructions are not included in the record on appeal; therefore, we are unable to review the precise charge to the jury relating to this offense.

The evidence introduced at trial, viewed in the light most favorable to the State, reflected that the Defendant and the victim were arguing after the Defendant terminated the victim's employment. After the victim hit the Defendant with his fist, the Defendant, using his firearm, shot the victim. The jury chose to accredit the testimony of the State's witnesses that the victim was unarmed and that the Defendant planted the knife after the shooting to support a theory of self-defense. Testimony established that the victim never carried a knife, that the Defendant owned a knife similar to the one found at the scene, and that the Defendant had made a comment that he would plant a knife if ever involved in a shooting. The victim later died as a result of the gunshot wound, and the Defendant was charged with and convicted of voluntary manslaughter, one of the statutorily-prescribed dangerous felonies. Following our review, we concluded that the evidence was sufficient to sustain the Defendant's convictions for voluntary manslaughter, employment of a firearm during the commission of voluntary manslaughter, and fabrication of evidence.[2]

## II. Sentencing

The Defendant takes issue with several sentencing determinations made by the trial court. At the time of the sentencing hearing, the Defendant was forty-eight years old, was divorced, and had two sons. The Defendant was born and raised in Kingsport. The Defendant stated that he was still living with his ex-wife. The Defendant also submitted that he had been employed by Kingsport Transfer Company since November 1979 until the date of the shooting. The Defendant reported that he had never done any illicit drugs with the exception of smoking some marijuana "socially" in his twenties. He reported his physical health as good, although he did suffer from asthma. He also described his mental health as "fair." His criminal history showed a domestic violence charge against his stepmother in April 2006; the presentence report reflects a disposition of "dismissed after 1 year reset."

The victim's wife completed a Victim Impact Statement, wherein she stated as follows:

---

[2] The Defendant also argues that the trial court erred by refusing to grant his motion for judgment of acquittal on all charges. This Court has noted that, "[i]n dealing with a motion for judgment of acquittal, unlike a motion for new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). We have already determined in the case herein that the evidence presented to the jury was sufficient to convict the Defendant. Consequently, the trial court did not err in denying the motion for judgment of acquittal as to these convictions.

I strongly feel this man should have to spend life behind bars. Sam Ireson should get life and I do not think he should be eligible for probation, he took a life and tried to plant evidence to keep himself out of trouble. He took a husband from his family.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

**A. Judicial Diversion**

The Defendant argues that the trial court erred by denying his request for judicial diversion on the voluntary manslaughter conviction and the fabrication of evidence conviction. Specifically, he argues that the trial court failed to give adequate consideration to his amenability for correction, his lack of a criminal record, and his social history. At the sentencing hearing, the Defendant acknowledged that Tennessee Code Annotated section

39-17-1324(e)(2) specifically prohibits judicial diversion for an individual convicted of employment of a firearm during the commission of a dangerous felony.[3]

"Judicial diversion is a legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999). The effect of discharge and dismissal under the diversion statute "is to restore the person . . . to the status the person occupied before such arrest or indictment or information." Id. (citing Tenn. Code Ann. § 40-35-313(b) (1997)).

A criminal defendant is eligible for judicial diversion only if he has been convicted of a misdemeanor or a class C, D, or E felony, and he must not have been previously convicted of a felony or a Class A misdemeanor. Tenn. Code Ann. § 40-35-313(a)(1)(A). However, eligibility under the diversion statute does not ensure the grant of diversion. Indeed, the decision of whether to place a defendant on judicial diversion is within the sound discretion of the trial court. State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996). Thus, upon review by an appellate court, if "any substantial evidence [exists in the record] to support the refusal," the decision of the trial court will be upheld, and this Court will not revisit the issue. State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983).

In making the determination of whether to grant judicial diversion, the trial court must consider the following factors: (a) the accused's amenability to correction; (b) the circumstances of the offense; (c) the accused's criminal record; (d) the accused's social history; (e) the status of the accused's physical and mental health; and (f) the deterrence value to the accused as well as others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997) (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused. Id. Additional factors which may be considered include a defendant's attitude, behavior since his arrest, home environment, current drug usage, emotional stability, past employment, general reputation, family responsibilities, and the attitude of law enforcement. Id. (citing State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993)).

In making its determination to deny the Defendant's request for judicial diversion, the trial court considered the following factors:

---

[3] Judicial diversion is available to a statutorily eligible defendant charged with multiple offenses. See State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App.1997) (citing State v. Harris, 953 S.W.2d 701 (Tenn. Crim. App. 1996)).

[T]he first thing is the [D]efendant's amenability to correction and on the one hand, you know, [the Defendant] had had apparently other than the issue in which he was placed on a type of probation. I mean there was never a plea but the case was put off for a period of time, a domestic violence case was put off for a period of time. Other than that I mean he really doesn't have that I have seen any criminal charges or anything that for which he had been required to comply with conditions of release. In that case it was dismissed after apparently the one year reset from . . . April of 06 to May of 07. This offense didn't occur until April of 08 but so in that sense that's a positive for him on amenability to correction. But on the other hand you have a situation where the jury found, and I approved of the jury's verdict, a situation where he basically planted a knife to show that the victim in this case was armed and therefore this was a self defense kind of case. The jury found that that was—that the victim did not possess it, found that [the Defendant] planted it and after he planted it he made statements to law enforcement and others that basically was in a—the jury—I think from which a person could find that he was deliberately lying to law enforcement about the facts and circumstances of the offense. And when a person is willing to do that, you know, lie to law enforcement and plant evidence in a case it basically puts them in a position of not being a good candidate for being amenable to correction. The reason is, is that if they're going to lie to law enforcement to protect themselves then they're going to lie to their probation officer and basically just do whatever they can to get out of doing whatever it is that they might be responsible for doing. So I find that you have a very—that that's a negative, that your amenability to correction is frankly low based upon the facts and circumstances of this case.

Number two, under the circumstances of the case I find that that is a negative as well basically for the reason I just stated in talking about amenability to correction, the fact that the knife was planted, the fact that you apparently lied to law enforcement about the facts and circumstances and, you know, the thing that kind of struck me as being very cavalier on your part, too, was is that after this occurred you basically went and just kind of waited for law enforcement, drank a beer. It was like, you know, "I have a carry permit and how could I have done any wrong because, you know, it's my business and there's the knife on the ground." Of course you knew at the time and the jury found that you planted it but that frankly I just think that you had a very, very cavalier approach to what happened and to this person's death so under the circumstances of the offense I think that's a negative to granting you deferral of judgment.

Of course the only criminal record you have now is as a result of the offense in this case and the gun charge but other than that you don't have that I found any criminal record. You do have a self-admitted brief criminal history 25 years ago where you were using marijuana as you indicated socially but I give that very little weight with regard to criminal history.

Your social history, of course I mean you have been married. You do have children. I'm not aware if you worked with your stepmother at some various points in time, I guess with your father, too, generally in this area so, you know, your social history—the only thing that is a little bit of a concern is the domestic violence charge that occurred in 2006 but I don't have any information on that other than what's in the report that it was reset for a year so I'm going to—I don't find that either a positive or negative.

Mental and physical health, there's really not been any—there's nothing in the report, nothing that I've heard here today that would create a problem. He indicates that his mental health is fair, that his physical health is good so nothing one way or the other with regard to that as regard of deferral of judgment.

Deterrence value to the [D]efendant and to the others, of course, you know, the thing that is so upsetting from the [c]ourt's perspective, you talk about someone having a gun permit. You know, there has been a lot of discussion in the legislature and in the press and others about individuals having the right to have a gun permit and to carry that permit and when someone has a gun permit they, just like with law enforcement, they have a responsibility to act responsibly and there was a lot of things that I heard during the trial that caused me to feel that [the Defendant], rather than taking his position as a gun permit holder as a responsible position and that he had a responsibility to others, I mean it was a situation where he used the weapon frankly as an intimidating factor, the fact that he, you know, it was a weapon that he carried openly so that everybody could see that he had a weapon. And while you know there was testimony that he carried it because he had cash I think it was clear that the reason that he did it was to intimidate others whether it be employees or his stepmother or others. I mean in my opinion, you know, when you have a weapon you have a responsibility to handle that weapon in a responsible manner. And I don't believe that [the Defendant] did and I don't believe that he felt, based on his actions after this, that he felt that in any way he had done any wrong and I'm not talking about the fact that he hasn't taken responsibility, because obviously he testified under oath that he believed that

-12-

he saw something and that he had the right to respond, that he felt like there was deadly force but the jury found otherwise and I listening to the evidence was otherwise as well. And I believe there is a deterrence value that just because you have a gun and just because you say that you felt like that you were going to be assaulted I mean in my opinion I just don't think that was the case. I think he planted the knife because he realized he had done wrong. So I think there's a deterrence value to that in this case. So I think that's a negative to granting deferral of judgment and for the things that I've just said I don't believe that judicial diversion will serve the interest of the public as well as the [D]efendant, that just because you have a valid carry permit you do have responsibilities not to lie and not to use the gun just because you have the—you can use the gun. Because even though you have the right to use the gun, in this case when you use it to commit voluntary manslaughter and frankly in this case, I mean I think it could have easily been second degree murder. I think a jury could have found that it was second degree murder. I mean I know that based upon statements that you had made with regard to—allegedly made with regard to that, you know, I think a jury perhaps could have found second degree murder. So in my opinion I don't think deferral of judgment or judicial diversion is appropriate in this case that the court should find that you're eligible based on all those factors.

Our review of the record reflects that the trial court gave full and proper consideration to the criteria that must be considered prior to the grant or denial of judicial diversion. The evidence in the record supports the trial court's conclusion; therefore, we may not revisit the issue. We cannot conclude that the trial court abused its discretion. The decision of the trial court denying judicial diversion is affirmed.

## B. Length of Sentence

The Defendant contends that the trial court erred in setting the length of his sentences for voluntary manslaughter and fabrication of evidence, both Class C felonies.[4] See Tenn. Code Ann. §§ 39-13-211(b), -16-503(b). The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of

---

[4] The Defendant's firearm conviction requires a mandatory minimum six-year sentence. See Tenn. Code Ann. § 39-17-1324(h)(1).

-13-

[the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

As a Range I standard offender, the Defendant faced a potential sentence of three to six years for each Class C felony sentence. See Tenn. Code Ann. § 40-35-112(a)(3). The trial court enhanced the Defendant's sentences based on a finding that he possessed or employed a deadly weapon during the commission of the offenses and had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(9), (10). The court awarded some mitigation based on his lack of a criminal record and excellent work history.

The Defendant argues that the trial court failed to give adequate consideration to his lack of a criminal record and excellent work history and failed to apply mitigating factors (2), the Defendant acted under strong provocation, and (11), the Defendant committed the offense

-14-

under unusual circumstances that it is unlikely a sustained intent to violate the law motivated the criminal conduct. See Tenn. Code Ann. § 40-35-113(2), (11), (13). He does not make any challenge to the trial court's application of enhancement factors. The State argues that the record supports the application of enhancement factors (9) and (10) and that the trial court did consider mitigating factors (2) and (11), properly finding that they did not apply.

Although the Defendant does not raise it as an issue on appeal, we conclude that the trial court erred by applying enhancement factor (9), that the Defendant possessed or employed a firearm during the commission of the offense, to the Defendant's voluntary manslaughter conviction because the Defendant was separately indicted and convicted of the offense of employing a firearm during the commission of the voluntary manslaughter. See State v. Brian Hervery, No. W2010-00675-CCA-R3-CD, 2011 WL 1225725, at *9 (Tenn. Crim. App., Jackson, Mar. 31, 2011). We find no error in the trial court's application of enhancement factor (9) to the Defendant's fabrication of evidence conviction because the proof showed that the Defendant continued to possess the firearm throughout the entire altercation at the back of the truck, including when he planted the knife.

Regarding the trial court's enhancement of the Defendant's sentence based on his commission of a crime when the risk to human life was high, we conclude the record does support its application to the Defendant's voluntary manslaughter conviction. This factor may be applied when individuals other than the victim may have been harmed by the commission of the offense. See State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002). Here, there was evidence that there were several others present at the time of the shooting; Mr. Guy and Mr. Gibson were extremely close to the altercation. Therefore, the trial court did not abuse its discretion in applying this enhancement factor to the Defendant's conviction for voluntary manslaughter. However, there was no proof to support application of this factor to the Defendant's fabrication of evidence conviction, and an enhancement factor may be considered only if it is "appropriate for the offense[.]" See Tenn. Code Ann. § 43-35-114.

The Defendant argues that the trial court did not give proper weight to his lack of a criminal record and his excellent work history and erred by failing to apply mitigating factors (2) and (11). The Defendant is mistaken in his assertions. In its sentencing determination, the trial court did consider the specific statutory mitigating factors, but found none applicable to the Defendant. The trial court did take into account the Defendant's lack of a criminal record, but gave it very little weight. The trial court also considered the Defendant's excellent work history.

Given the facts of this case, we conclude that enhancement factor (9) was properly applied to the fabrication of evidence conviction and enhancement factor (10) was properly applied to the voluntary manslaughter conviction. Thus, despite the misapplication of

enhancement factors, and given the non-binding nature of enhancement factors and the discretion now afforded to trial courts under our new sentencing laws, we affirm the sentence as imposed. We conclude that the trial court did not err or abuse its discretion in setting the Defendant's sentences at five years for both of his Class C felony convictions.

## C. Consecutive Sentencing

Finally, the Defendant challenges the trial court's decision to run his fabrication of evidence sentence consecutively to his sentences for voluntary manslaughter and employment of a firearm during the commission of a dangerous felony.[5] Tennessee Code Annotated section 40-35-115 provides that a trial court may, in its discretion, impose consecutive sentencing when it finds any one of a number of different factors by a preponderance of the evidence, including that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

As to the consecutive service, the trial court ruled as follows:

I do find . . . that this was a case when the risk to human life was high not only with regard to the deceased in this case but the others that were around and I find that the [D]efendant's actions at the time of the crime and afterwards, the planting of the evidence and basically just drinking a beer, shows that he really has no regard for human life. The way he possessed the weapon and displayed his weapon as a sidearm when he went into the bank or when he went there in front of his [stepmother] at the business or whereever he went, carried this weapon, showed in my opinion that he was very cavalier about the carrying of that weapon and frankly in my opinion shows that he just really didn't have a whole lot of—had little or no regard for human life based upon his actions at the time. So I find that that factor applies. I also find, too, that in this particular case that an extended sentence is necessary to protect the public against further criminal conduct by the [D]efendant, again based upon the nature and circumstances of this crime and the fact that the [D]efendant, you

---

[5] The sentence for employment of a firearm during the commission of a dangerous felony shall be served consecutively "to any other sentence the person . . . is sentenced to serve for conviction of the underlying dangerous felony." See Tenn. Code Ann. § 39-17-1324(e)(1).

know, lied to law enforcement and planted evidence. In my opinion I think he would still continue to commit those kinds of things and because of the nature of this case, the fact that it involves not only a death but also planting of evidence to take away any responsibility for the death in this case I find that its reasonably related to the severity of the offense committed so in my opinion those two sentences should be consecutive to each other so each of those sentences, the 5 years should be consecutive to each other.

In our view, the trial court properly ordered consecutive sentences on the grounds that the Defendant is a dangerous offender. The trial court made the required findings, and they are supported by the record.

## Conclusion

Based upon the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
DAVID H. WELLES, JUDGE